[Civ. No. 27179.    Second Dist., Div. Four.    Feb. 23, 1965.]

JAMES THOMSON et al., Plaintiffs and Appellants, v. INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYES AND MOVING PICTURE MACHINE OPERATORS OF THE UNITED STATES AND CANADA, etc., et al., Defendants and Respondents.

Alexander H. Schullman, Leslie C. Burg and Herbert E. Selwyn for Plaintiffs and Appellants.

Bodkin, Breslin & Luddy, Michael G. Luddy, O'Melveny & Myers, Charles G. Bakaly, Jr., and Stuart K. Mandel for Defendants and Respondents.

KINGSLEY, J.—The plaintiffs and appellants, five in number, are individuals who have been employed and are now employed as sound technicians in the motion picture and television industry in the Hollywood area. They are members of defendant and respondent International Sound Technicians

Local 695, hereinafter referred to as defendant Local, and their complaint has been filed individually and on behalf of 350 members of said Local 695, "similarly situated." They appear as persons employed under Schedule B of the contract, hereinafter discussed, and as representatives of all Schedule B employees. Defendant Local was and is the certified bargaining representative of its members and is a chartered local of defendant and respondent International Alliance of Theatrical Stage Employes and Moving Picture Machine Operators of the United States and Canada, hereinafter referred to as defendant International, with which 24 locals, engaged in the motion picture and television industry in the Hollywood area are chartered.

Certain individual defendants and respondents were officers and members of negotiating committees of defendant Local in connection with negotiations with employers, hereinafter described, which resulted in a collective bargaining agreement. Defendant and respondent Thomas Carman was, at all times material, the business representative of defendant Local. Defendant and respondent Richard Walsh is, and at all times material has been, president of defendant International. Defendant and respondent George Flaherty, at all times material, was the international representative of defendant International.

The major representatives of the defendants and respondents motion picture and television producers in the Hollywood area were the defendants and respondents Association of Motion Picture Producers, Inc., and its negotiator, defendant Charles Boren, and the Alliance of Television Film Producers, Inc., and its negotiator, defendant Richard W. Jencks. All of the above will hereinafter be described as defendant Producers.

The complaint, filed July 3, 1961, seeks relief for breach of contract; for specific performance; for permanent injunction; for general and special damages; for exemplary damages; for payment of retroactive wages; for constructive trust and an accounting; declaratory relief; in equity, for reasonable counsel fees, and for promissory estoppel. The answer was filed September 8, 1961. The trial of this matter commenced on April 19, 1962, without a jury, and lasted to and including May 9, 1962, with occasional continuances. On July 6, 1962, the trial court made its findings of fact and conclusions of law, and on the same day entered judgment for defendants in this matter. On July 23, 1962, plaintiffs filed a notice of in-

tention to move for a new trial, and on August 2, 1962, the motion for new trial was argued, and said motion was denied. Plaintiffs have appealed from the judgment rendered in favor of defendants.

We set forth the basic facts which constitute the background for the present litigation. The facts as here stated were either uncontradicted, or were found by the trial court, on sufficient evidence, to be true and are, thus, facts which we are bound on this appeal to accept.

For many years members of defendant Local, in all classifications of seniority except the very lowest, could have been employed under four different schedules in accordance with the desires of the Producers. Each such sound technician could have been employed under Schedule A, by which he was guaranteed one day's employment; the same sound technician could have been employed under Schedule B, by which he was guaranteed a minimum of one week's employment but by which he received a lower hourly rate of pay; the same sound technician could have been employed under Schedule C, by which he was guaranteed a minimum of six weeks' employment but by which he received a lower hourly rate of pay than under Schedule B; or the same sound technician could have been employed under Schedule D, by which he was guaranteed a minimum of one year's employment but by which he received a lower hourly rate of pay than under Schedule C.

Although plaintiffs, and the other technicians whom they claim to represent herein, were normally employed under Schedule B, the trial court found, on evidence sufficient to support the finding, that:

"27. During the two-year period prior to January 30, 1961 most of the individual sound technicians were employed under Schedule A for a portion of the period, under Schedule B for a portion of the period and under Schedule C for a portion of the period. A total of approximately 225 sound technicians were employed by individual studios operated by the members of defendant Association under both Schedule B and Schedule C during the two-year period prior to January 30, 1961. In addition most sound technicians were employed by many different members of defendant Association as well as by other motion picture producers and were employed under Schedule B at one studio and under Schedule C at another during said two-year period.

"28. During the two-year period prior to January 30, 1961

most of the plaintiffs were employed by some of the Producer defendants under Schedules A and B, although most of them had at some time prior thereto been employed under Schedule C and some of them had been employed under Schedule C during the two-year period prior to January 30, 1961.''

Commencing in 1946, defendant Local demanded the elimination of Schedules C and D, because these schedules had become inequitable and discriminatory to the members. Defendant Local maintained that the guarantee of six weeks' or one year's employment was not as advantageous as previously and did not outweigh the disadvantages of the much lower hourly rates of Schedules C and D. Moreover, many sound technicians were in fact being employed for six weeks or longer. Thus there developed, according to defendant Local, the inequitable situation of sound technicians in the same classification working side by side but getting paid substantially different hourly rates. This was the inequity of which defendant Local complained. Furthermore, by 1959, the inequity and discrimination had become greater after each negotiation because of percentage increases given to all schedules.

The defendant Producers consistently resisted these demands on the ground that elimination of the right to employ sound technicians under Schedules C and D would greatly increase their costs. However, in the 1959 negotiations, when defendant Local's only demand was to eliminate Schedules C and D, defendant Producers finally agreed to eliminate Schedule D, the yearly guarantee, because it was seldom used. But the Producers continued to resist elimination of Schedule C on the ground that it would cost them several hundred thousand dollars in addition to the cost of a wage increase, and would, in effect, amount to a 26 per cent increase in the cost of employing sound technicians. Negotiations on this issue continued several months after the Memorandum Agreement of 1959 had been entered into, at which time the required pre-strike notification was transmitted by defendant Local to the Federal Mediation and Conciliation Service. The impasse was finally resolved by the defendant Producers agreeing that, if a sound technician who was employed under Schedule C remained employed for more than six weeks he must receive a six weeks' guarantee at the expiration of the first six-week period in addition to his original minimum guarantee of six weeks' employment.

However, this new agreement, in operation for two years,

resulted in a further inequity. Sound technicians with the greater seniority were being adversely affected by the use of Schedule C with its new requirement of successive guarantees of an additional six weeks. Sound technicians with lesser seniority, whose employment exceeded the six weeks' block of employment were being automatically guaranteed a second six weeks' block of employment, and, consequently, could not be laid off until the completion of the second six weeks' block. As a result sound technicians with greater seniority were being laid off, while those with lesser seniority continued to be employed.

In the 1961 negotiations, defendant Local's principal demand again was to eliminate Schedule C. The defendant Producers again resisted the demand. In fact, some of the defendant Producers who had not previously used Schedule C to any appreciable extent were considering increasing their employment under this schedule. The defendant Producers resisted the demand because to accede to it would cost approximately $700,000 in addition to the cost of any wage increase and would open the door to similar demands by other locals.

Defendant Boren, however, did suggest, at a bargaining session on January 5, 1961, that the wage schedules might be increased disproportionately, so as to substantially cure the inequity between B and C rates. He further stated that such a disproportionate increase to Schedule C might cause it to fall into substantial disuse by the defendant Producers and thereby defendant Local would, in practice, achieve an elimination of Schedule C. Defendant International and defendant Local did not accept defendant Boren's proposal at that time, but continued to demand the elimination of Schedule C. At a bargaining session held on January 27, 1961, the subject was again discussed, with defendant Boren stating that the defendant Local had a "self-help" remedy by increasing the wage schedules disproportionately in such a way as to eliminate any inequity thought to exist. Finally, at a meeting on January 28, 1961, the defendant Producers and the defendants International and Local stated that defendant Local was to be given the right either to increase the wage schedule disproportionately by any amount of money to be measured by a percentage of the total payroll in order to eliminate the inequity, provided that the cost to defendant Producers could not exceed the percentage increase of the total payroll for sound technicians agreed upon in the negotiations, or to increase the wage

schedules proportionately by a percentage of the total payroll and therefore not eliminate the inequity. Such percentage increase was later agreed by the parties to be 10 per cent.

On January 30, 1961, defendants Boren and Jencks, on behalf of defendant Producers, and defendant Walsh on behalf of defendant International, executed a document entitled "Memorandum Agreement of 1961." It provided in part for a "10 per cent general increase" to all locals. It also provided that, "This memorandum is not in final contract language. A formal agreement shall be drafted between the parties, as soon as possible."

Defendant Carman apprised the executive board of defendant Local of the alternative proposals before them. The executive board of defendant Local adopted a recommendation of its steering committee and negotiating committee that the two alternative plans be placed before a general meeting of the membership on February 6, 1961, for discussion and action. On February 6, 1961, a general membership meeting was held, which was described in the testimony at trial as the largest in the defendant Local's history. At that meeting, a majority of the membership, by vote, approved and ratified all of the changes and modifications in the most recently current collective bargaining agreement with the single exception of changes and modifications with respect to wage rates for the classifications and schedules. On motion of one of the named plaintiffs, it was determined by the membership that, as to such changes and modifications with respect to wage rates, a subsequent ballot by mail should be taken for the purpose of choosing either a proportional increase or a disproportionate increase between Schedules A and B.

Between February 9, 1961, and February 23, 1961, the secret ballot by mail was conducted, which resulted in the approval by a majority of the membership of defendant Local of a plan whereby wage rates under Schedule A were to be increased approximately 10 per cent, the wage rates under Schedule B were to remain the same, but the wage rates under Schedule C were to be increased approximately 20 per cent.

The disproportionate increase in Schedule C rates so increased this schedule that they are now almost equal to Schedule B rates. The effect of this disproportionate increase was to substantially remove the inequity as well as to decrease the use of Schedule C by the defendant Producers by 50 per cent in the first year of the new agreement.

Plaintiffs' first contention is that the Memorandum Agreement of 1961, which provided for a ''10 per cent general increase'' to all locals is a binding contract vesting in plaintiffs the right to said increase. However, ample evidence was presented at trial that an oral agreement had been reached by the negotiating committees that any and all tentative understandings or agreements reached by the negotiating committees, such as those contained in the Memorandum Agreement of 1961, would not be final until ratified by the memberships of the various locals of defendant International and approved by each of the defendant Producers. This ground rule, it appears from the evidence, had, in fact, been in effect in each negotiation between the parties since 1947.

During the trial, but not on appeal, plaintiffs objected to the use of this parol evidence. ■ However, the rule is clear that the parol evidence rule does not prevent the admission of testimony to ascertain whether a document, claimed to be an agreement, was so intended by the parties. (*Halldin* v. *Usher* (1958) 49 Cal.2d 749 [321 P.2d 746].) ■ Furthermore, ''It may also be shown that the writing was not intended as a final act because it is not to become effective until some condition happens.'' (Witkin, Cal. Evidence (1958) § 367, p. 409, and cases cited therein.)

■ Plaintiffs refer the court to some evidence presented at trial to the effect that various defendants, representatives of defendants and local trade journals, either admitted or published news of the general increase of 10 per cent. Whether these ''admissions'' and publications tend to prove that a specific increase for Schedule B sound technicians was entered into is highly questionable, since the Memorandum Agreement of 1961 was the result of negotiations concerning the contract demands of 24 different locals. At any rate, these ''admissions,'' at best, merely permitted an inference in support of plaintiffs' contention; they were only part of the evidence before the trial court and its finding of fact that the Memorandum Agreement of 1961 was not a final and binding agreement is supported by substantial evidence.

## II

■ Plaintiffs next contend that the defendants are promissorily estopped from asserting the lack of ratification of the Memorandum Agreement of 1961. They assert that the Memo-

randum Agreement of 1961, containing the 10 per cent general wage increase, was a promise clear and unambiguous. Whatever merits there are to this point, it is nevertheless clear that all of the elements of promissory estoppel are not present in this case.

These elements are set forth in the case of *Graddon* v. *Knight* (1956) 138 Cal.App.2d 577, 583 [292 P.2d 632]: ". . . (1) a promise clear and unambiguous in its terms (*National Dollar Stores, Ltd.* v. *Wagnon,* 97 Cal.App.2d 915 [219 P.2d 49]); (2) reliance by the party to whom the promise is made (*Estate of Jackson,* 112 Cal.App.2d 16 [245 P.2d 684]); (3) his reliance must be both reasonable and foreseeable (*Pacific Finance Corp.* v. *Hendley,* 119 Cal.App. 697 [7 P.2d 391]); Rest. Contracts, § 90); (4) the party asserting the estoppel must be injured by his reliance (*National Dollar Stores, Ltd.* v. *Wagnon, supra*)."

Plaintiffs assert that the deprivation of a 10 per cent wage increase, so that plaintiffs received no wage increase for the year, represented injury to them. This may be true. But it does not establish that the injury is the result of reliance upon the Memorandum Agreement of 1961.

Other lesser arguments are made, attacking the findings in favor of the finality or enforceability of the subsequent "Basic Agreement." Plaintiffs point to the letter of Zeal Fairbanks, a representative of defendant International, which required adherence to the Memorandum Agreement of 1961 with the exception of minor changes. However, if this letter indicates a desire on the part of the negotiators to preclude a specific change in the wage scale of Schedule B from that provided for in the Memorandum Agreement of 1961, it is in conflict with other substantial evidence presented in the case. In such an event the trial court is free to believe whichever evidence it deems to be the weightier.

### III

Defendants contend that portion of the Memorandum Agreement of 1961 providing for:

"General Wage Increases.

"a) 10% general increase commencing as of January 31, 1961."

is ambiguous. The trial court so found. However, it is unnecessary to decide this point as it is also unnecessary to decide whether the plaintiffs are third party beneficiaries to the Memorandum Agreement of 1961 rather than principals and

thereby unable to enforce the agreement even if it were final and binding—an issue which the trial court decided adversely to plaintiffs.

Even if the Memorandum Agreement of 1961 were final and binding it would vest in plaintiffs no interests which could not be impaired or extinguished by a subsequent agreement.

The trial court found that, in February 1961, the Basic Agreement was executed by defendant International and by defendant Producers. That agreement provides in part that: "This agreement . . . shall, as of its effective date, terminate and replace the Memorandum Agreement of 1961 between the parties hereto dated January 30, 1961. . . ."

The case of *International Longshoremen's & Warehousemen's Union* v. *Kuntz* (9th Cir. 1964) 334 F.2d 165 answers plaintiffs' contention. That case involved an amendment to the collective bargaining contract whereby 38 employees, who had been allowed to register into a higher classification for seniority under the unamended contract, were forced to deregister under the amended contract. Thereafter, under the amended contract, 53 positions were made available in the higher seniority classification whereby the original 38 lost seniority vis-a-vis the new registrants.

The court said, at page 171: "The settlement of a labor dispute, whether accomplished by amendment of the contract or by resort to an already existing contract provision, may affect rights which in other fields are regarded as vested and in a manner which would be deemed '*ex post facto.*' But where the power to bargain is not limited by the contract and since '[c]ompromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation', [*Ford Motor Co.* v. *Huffman,* 345 U.S. at p. 338, 73 S.Ct. at p. 686, 97 L.Ed. at p. 1058] we believe that when 'vested rights' are impaired or extinguished in the course of bargaining, any recourse by the person affected must then depend upon '*a bad faith motive, an intent to hostilely discriminate*' on the part of the bargaining representative. And here, even aside from the plaintiff's affidavit asserting that no such discrimination existed, there is not the slightest suggestion of bad faith on defendants' part." (Italics added.)

IV

The next contention which plaintiffs urge, is that defendant unions violated their duty of fair representation. The United

States Supreme Court, in the leading case of *Steele* v. *Louisville & Nashville R.R. Co.* (1944) 323 U.S. 192, 202-203 [65 S.Ct. 226, 89 L.Ed. 173], held that: ''Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body *both to create and restrict the rights of those whom it represents,* [citations] but it has also imposed upon the representative a corresponding duty . . . . to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them.'' (Italics added.)

■ In the instant case, it is clear that the rights of the Schedule B employees were restricted by the failure to give them a wage increase. This the union representatives had a right to do as long as it was in the best interests of the union (*Ford Motor Co.* v. *Huffman* (1953) 345 U.S. 330 [73 S.Ct. 681, 97 L.Ed. 1048]), and devoid of hostile discrimination.
■ The facts of the instant case establish both of these elements.

For some time the use of Schedule C had plagued the union. Many defendant Producers employed sound technicians under that schedule in order to make use of the lower scale of wages involved. Furthermore, dissention among union members was caused when some sound technicians were paid the higher wage rates under Schedules A and B while on the same job with those employed under Schedule C and earning a salary at a lower wage rate. Furthermore, the added six weeks' guarantee negotiated in the 1959 contract for sound technicians employed under Schedule C caused many of those with lesser seniority to be employed while those with greater seniority working under another schedule were laid off. The problem became even more aggravated when it was learned that some of the defendant Producers who theretofore had not substantially made use of Schedule C were planning to do so. It is clear that the negotiators for defendant unions would have preferred to eliminate Schedule C outright. Unable to do this, they decided to disproportionately increase the wage rates under Schedule C while at the same time withholding any increase in the wage rates under Schedule B so as to bring the two schedules more closely into line. With much of the economic advantage attendant to the use of Schedule C by the defendant Producers gone, it was reasoned that Schedule C would fall into disuse. As of now, this is exactly what is happening. It is readily apparent that the negotiators for the defendant unions had in mind the best interests of the union

members as a whole and that any intent toward hostile discrimination was absent. In fact, during the tenure of defendant Carman as business representative of defendant Local, the named plaintiffs Daniels and Thomson were promoted to higher permanent classifications. Such promotions could not have been achieved without the sanction of defendant Local.

In addition, as we have pointed out above, all of the plaintiffs were subject to being employed under any of the schedules, from time to time, at the whim or discretion of the particular employer currently involved. Under these circumstances, it is impossible to say that the total process of negotiations, culminating in the final "Basic Agreement" which contained the wage rates complained of, was intended to discriminate against any individual member or against any definable group of members—the negotiations and the final agreement clearly were, as the trial court found, intended to be for the benefit of the union as a unit. This was the duty of the negotiators; they had no other.

V

Finally, plaintiffs assert that the Basic Agreement of 1961, which provided for the disproportionate increase in wage rates for Schedule C and the previous (unincreased) wage rates for Schedule B was never ratified by defendant Local. They allege that no notice of the meeting of February 6, 1961, was sent out advising the membership that a vote on the terms of the Basic Agreement of 1961 was to be taken. The trial court found to the contrary. In fact, as the evidence showed and the trial court found, the meeting of February 6, 1961, was one of the largest in the history of the union. Furthermore, the issue herein involved—the provisions calling for a disproportionate increase in wage rates for Schedule C and the lack of an increase in wage rates for Schedule B—was not voted on at that meeting but was rather voted on in secret ballot by mail between February 9 and February 23, 1961, and ratified. There is no merit to this contention.

The judgment is affirmed.

Jefferson, Acting P. J., and Frampton, J., pro tem.,* concurred.

A petition for a rehearing was denied March 16, 1965, and appellants' petition for a hearing by the Supreme Court was denied May 12, 1965.

---

*Assigned by the Chairman of the Judicial Council.