DONALD H. AND JACQUELINE KAY KEIL, d/b/a K & K WHOLE-SALE SEED COMPANY, OF CONRAD, PLAINTIFF AND RESPONDENT, v. GLACIER PARK, INC., DEFENDANT AND APPELLANT.

No. 14134.
Submitted May 27, 1980.
Decided July 11, 1980.
614 P.2d 502.

Frisbee & Moore, John P. Moore argued, Cut Bank, for defendant and appellant.

Keil & Gustafson, Dale L. Keil argued, Conrad, for plaintiff and respondent.

MR. JUSTICE HARRISON, delivered the opinion of the Court.

Appellant, Glacier Part, Inc. (herein Glacier), is a corporation that owns and operates hotels and concessions throughout Glacier National Park. It also owns and operates the water system that delivers water to Glacier Park Lodge and the community of East Glacier.

Flooding in the early summer of 1975 washed-out a portion of the waterline owned by Glacier. The washout cut off the water supply to East Glacier and Glacier Park Lodge. Shortly after the washout, Mr. Herb Sammons began trying to obtain a pump capable of bringing water from a creek into the water system at a point below the waterline washout. Mr. Sammons was the Search and Rescue Coordinator for Glacier County and had supervised the placing of an emergency pump on the water system in a similar washout in 1964.

After placing a pump on the waterline that could not properly handle the water supply problem, Mr. Sammons contacted respondent Don Keil by telephone. The telephone conversation between Mr. Keil and Mr. Sammons took place on either June 20 or 21, 1975. The content of the telephone conversation is one point of controversy in this case. The parties agree that Mr. Sammons asked Mr. Keil if he could provide a pump for the East Glacier water system. The parties further agreed that Mr. Keil said he did have a pump that could handle the problem. The parties then discussed the payment that Mr. Keil would receive for the use of the pump. The parties disagree, however, as to the content of the conversation concerning payment. Glacier contends Mr. Sammons told Mr. Keil that the Federal Flood Disaster Program would pay a rental rate of $5.00 per operation hour up to $100.00 per day for the use of the pump. The Keils contend Mr. Sammons only said that federal disaster money was usually available for these kinds of occurrences and that in 1964 the Federal Disaster Administration paid $100.00 per day for rental of a pump. They contend Mr. Sammons indicated they would be paid the prevailing rate for the rental of the pump but that he was not sure who would make the payment. The Keils assert Mr. Sammons told Mr. Keil to contact Mr. Don Hummel, Glacier's president and general manager, for further information about payment for the use of the pump.

Don Keil subsequently asked his brother, Dale Keil, to contact Mr. Hummel to determine if Mr. Hummel was the person who had authority to make arrangements for the pump. Dale Keil called

Mr. Hummel, and Mr. Hummel indicated he was making arrangements for the pump.

On June 22, 1975, the Keils delivered the pump to the pumping site at East Glacier. They then went to the Glacier Park Lodge and met with Mr. Hummel. They told Mr. Hummel that the pump had been delivered and would be hooked up the next morning. Once again there is disagreement as to the content of the conversation between the Keils and Mr. Hummel. Glacier contends Mr. Hummel and the Keils discussed and agreed upon a rental rate for the use of the pump. Glacier contends the parties agreed to the $5.00 per hour, $100.00 per day maximum discussed earlier by Mr. Sammons and Mr. Keil over the telephone. The Keils contend there was no discussion of the rental rate during the conversation.

The next morning Mr. Keil put the pump into operation. The pump operated until June 29, 1975, without further contact between Mr. Keil and Mr. Hummel. Sometime prior to June 29, Mr. Keil called Weissman and Sons in Great Falls to determine the prevailing rental rate for equipment and services similar to those he was providing for Glacier.

On June 29, Mr. Keil and Stan Hould, a business associate of Mr. Keil, met with Mr. Hummel at Glacier Park Lodge. Mr. Keil presented Mr. Hummel with a proposed agreement for the use of the pump. The agreement called for a rental rate of $15.00 per hour and payment for 50 hours of moving time. Mr. Hummel objected to the terms of the contract and refused to sign the agreement.

The parties disagree as to what happened next. Glacier contends Mr. Keil threatened to remove the pump if Mr. Hummel did not sign the agreement. Glacier contends that because of this threat and the town's dependence on the pump, Mr. Hummel finally agreed to sign an amended agreement. In doing so, according to Glacier, Mr. Hummel expressed his objections to the tactics used in obtaining his signature and pointed out the existence of what he considered to be a previous valid agreement providing for a rental payment of $100.00 per day. The Keils deny that Mr. Keil ever

threatened to remove the pump. They assert the parties negotiated the rental payment schedule and came to an agreement as to the rental rate, maintenance of the pump while in service and the term of the rental period.

Mr. Keil and Mr. Hummel signed a written agreement on June 29. The agreement called for a $10.00 per hour rental payment for the time the pump was operating, provided for payment for 48 hours moving time, provided that the Keils would service the pump and purchase the fuel for the pump and set the term of the rental at 30 days. A clause added to the agreement for clarification of the 30-day term of the lease stated Glacier agreed to pay for the use of the pump for 30 days unless the Keils removed the pump from service before that time. The clause required the Keils to give Glacier one week notice before removing the pump. The agreement was signed and dated by both parties below the initial terms of the agreement and signed again below the clarifying clause.

On July 2, 1975, Federal Flood Disaster Program personnel installed another pump on the East Glacier waterline and disconneted the Keils' pump. Mr. Hummel notified Mr. Keil of the action by letter dated July 2, 1975. The letter also indicated Glacier had no further use for the pump and that Mr. Keil could pick the pump up.

Mr. Keil responded to Mr. Hummel's letter in a letter dated July 7, 1975. Mr. Keil stated that he considered the June 29 contract to be in full force and effect and would have the pump available for use by Glacier for the remainder of the contract period. The letter indicated the pump would be moved to a storage yard as a security measure. Mr. Keil did remove the pump to a storage yard, and it remained there for the duration of the 30-day contract period.

The Keils demanded payment under the terms of the June 29 contract. Glacier refused to pay, asserting the contract was void.

Donald and Jacqueline Keil then filed this action in District Court, Glacier County. The Keils sought to recover damages from Glacier for breach of contract. A trial was held before the Honorable Nat Allen, sitting without a jury. Following the trial,

Judge Allen awarded judgment to the Keils in the amount of $6,380.00 plus interest in the amount of $831.91. Judge Allen also awarded the Keils costs and disbursements. Glacier filed a motion for either a new trial or a reconsideration of the court's findings and conclusions. The District Court denied the motion. This appeal followed.

Glacier raises the following issues on appeal:

1. Was there a valid oral contract entered into between Mr. Keil and Glacier prior to the execution of the June 29 written contract?

2. Was there consideration for the June 29 written contract signed by Mr. Keil and Mr. Hummel?

3. Was the June 29 written contract signed by Mr. Keil and Mr. Hummel invalid due to duress, menace or undue influence?

Looking to Glacier's first issue, the essential elements of a contract are: parties capable of contracting; consent; a lawful objective; and, consideration. Section 28-2-102, MCA. A contract may be oral unless specially required to be in writing by statute. Section 28-2-901, MCA. Glacier contends that all the elements of a valid oral contract are present here and that a contract for the use of the pump existed between it and the Keils before the execution of the June 29 written contract.

■ Where the existence of an oral contract is contested and the evidence is conflicting, the existence of the contract is a question for the trier of fact. *Coble v. Scherer* (1979), 3 Kan.App.2d 572, 598 P.2d 561, 564; *Curran v. Hastreiter* (Alaska 1978), 579 P.2d 524, 526. Here the finder of fact was the District Court since the case was tried without a jury. The District Court found that Mr. Sammons and Mr. Keil did not agree as to the capacity of the pump needed by Glacier, the pump accessories to be provided by the Keils, who was to provide fuel for the pump, who was to maintain the pump, or the rental rate of the pump other than a reasonable rate. The District Court also found there was no mention of the rate Mr. Keil would be paid for the use of the pump when Mr. Keil and Mr. Hummel first met in the Glacier Park Lodge on June 22 prior to the installation of the pump. Based on these findings, the District

Court concluded Mr. Keil delivered the pump to East Glacier, ". . . on only the assurance that he would be paid the prevailing rate therefor."

■ This Court will not disturb a judgment on appeal where substantial evidence to support the judgment appears on the record. *Knight and Co. v. Manaras* (1979), 184 Mont. 448, 603 P.2d 675, 676-677; *McGuire v. American Honda Co.* (1977), 173 Mont. 171, 177, 566 P.2d 1124, 1127. This is especially true when the District Court has upheld the sufficiency of the evidence on a motion for a new trial. *McGuire*, supra, 173 Mont. at 177-178, 566 P.2d at 1127. Further, on appeal the evidence must be viewed in the light most favorable to the prevailing party at the trial level. *Knight*, supra, 603 P.2d at 676, 36 St.Rep. at 2150. See also *Curran*, supra, 579 P.2d at 527.

Applying this standard to the case at bar, there appears to be substantial evidence on the record to support the findings and conclusions of the District Court. A valid oral contract could arguably have been formed between Glacier and the Keils as a result of either the telephone conversation between Mr. Keil and Mr. Sammons or the June 22 conversation between Mr. Keil and Mr. Hummel at the Glacier Park Lodge.

■ Concerning the telephone conversation, Mr. Keil testified that Mr. Sammons asked him to bring the pump to East Glacier and told him he would be paid the prevailing rate for the rental of the pump. Although Mr. Sammons disagreed that he told Mr. Keil he would be paid the prevailing rental rate, Mr. Sammons did state he and Mr. Keil did not discuss the specifics of any contract they might be entering into such as who would furnish fuel for the pump. This testimony indicates substantial evidence on the record to support the conclusion that Mr. Keil and Mr. Sammons did not enter into a contract.

As for the conversation between Mr. Keil and Mr. Hummel on June 22, Don Keil, his former wife Kay Keil, his brother Dale Keil, and his sister-in-law Sherri Keil, all testified there was no mention of the rental rate for the pump during that conversation. This

testimony, although disputed by Mr. Hummel, indicates the record contains substantial evidence to support the conclusion that no oral contract resulted from the June 22 conversation between Mr. Keil and Mr. Hummel. Therefore, we will not disturb the findings and conclusions of the District Court on this issue.

Glacier also contends this Court should find the existence of a valid contract before the execution of the June 29 written contract based on Section 90 of the Restatement of Contracts. That section reads:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Rest. Contracts (1932), § 90 at 110.

Although this section of the Restatement is not so entitled, it is commonly referred to as the doctrine of promissory estoppel. *Bixby v. Wilson & Company* (D.Iowa 1961), 196 F.Supp. 889, 903.

The doctrine of promissory estoppel has been previously recognized by this Court. *Fiers v. Jacobson* (1949), 123 Mont. 242, 249-251, 211 P.2d 968, 972-973. The elements of promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) reasonableness and foreseeability of the reliance; (4) the party asserting the reliance must be injured by the reliance. *Laks v. Coast Federal Savings & Loan Association* (1976), 60 Cal.App.3d 885, 131 Cal.Rptr. 836, 839; *Thomson v. International Alliance of Theatrical Stage Employees* (1965), 232 Cal. App.2d 446, 42 Cal.Rptr. 785, 790.

The first element that must be established to prove a contract by the doctrine of the promissory estoppel is the existence of a clear and unambiguous promise. The terms of the promise must be certain, as there can be no promissory estoppel without a real promise. *Metropolitan Convoy Corp. v. Chrysler Corp.* (1965), 58 Del. 286, 208 A.2d 519, 521; *National Dollar Stores v. Wagnon* (1950), 97 Cal.App.2d 915, 219 P.2d 49, 52. Promissory estoppel

cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a contract. *Wagnon*, supra, 219 P.2d at 52. See also, *Anderson v. KFBB Broadcasting Corp.* (1964), 143 Mont. 423, 430-431, 391 P.2d 2, 6.

*Laks* presents a good discussion of the first element of promissory estoppel. *Laks* involved a contract to provide interim and long-term financing for the construction of a motel. Mr. Laks and an associate had contacted the Coast Federal Savings & Loan about providing financing to build a Sheraton Motor Inn. After a series of discussions on the matter, Coast sent Mr. Laks' agent a letter outlining the financing the bank would be willing to provide. The letter included the amount of the long-term financing, the interest rate on the long-term financing and the term of the long-term financing. The letter also included a general discussion of interim financing, the method of ownership of the motel and the management of the motel on completion. The letter did not include an amount for the interim financing, provisions for securing the loan, remedies of the lender on default or prepayment conditions.

After receiving the letter, Mr. Laks proceeded to procure the permits and contracts necessary to build the motel and stopped looking for other financing. Coast subsequently decided not to loan Mr. Laks the money to build the project. At the time Coast made the decision, Mr. Laks had only 45 days within which to break ground on the motel to maintain his building permit. He did, however, succeed in building the project with other financing although the financing was substantially more expensive.

Mr. Laks and his associate brought a claim for breach of a contract to provide financing for the project against Coast based on a theory or promissory estoppel. The California court pointed out that the letter sent by Coast to Laks left the final terms of a loan far from complete and that this should put the offeree on notice that the parties were still in the negotiation process and that finalization of the terms would require further negotiations. 131 Cal.Rptr. at 839. The court stated the evidence indicated the parties had simply agreed to agree upon terms in the future. 131 Cal.Rptr. at

840. With the uncertainty of the terms of the alleged contract and the mere existence of an agreement to agree on final terms at a later date, the court concluded the essential element of a clear and unambiguous promise was missing from a promissory estoppel claim and affirmed the lower court's dismissal of the action. 131 Cal.Rptr. at 841.

■ Here, the District Court found that while the parties had agreed that Mr. Keil would provide the pump for Glacier's use, there was no agreement as to the pump accessories to be provided by the Keils, who was to provide fuel for the pump or who was to maintain the pump. Further, the parties had only agreed that the Keils would be paid a reasonable rate for the use of the pump; no specific amount was agreed upon. The District Court also found that Mr. Sammons told Mr. Keil to contact Mr. Hummel for further information about the Keils providing the pump to Glacier.

Thus, this is a classic case of a promise not sufficiently clear or unambiguous to satisfy the first element of a promissory estoppel claim. Only one of the terms of the promise, that the Keils would provide the pump, was clearly stated. All other material terms of a rental contract were absent, including the specific rental rate and who was to provide fuel for the pump. This should have put Glacier on notice that the parties needed to negotiate further before finalizing an agreement. It also appears that the parties actually did contemplate further negotiations. Mr. Sammons told Mr. Keil to contact Mr. Hummel for further information about the rental of the pump.

The parties here had nothing more than an agreement to agree that was in the initial stages of the negotiation process. This does not constitute the clear and unambiguous promise necessary to satisfy the first element of a promissory estoppel claim. Therefore, Glacier's contention that this Court should find the existence of a valid contract before execution of the June 29 written contract based on Section 90 of the Restatement of Contracts is rejected, and the District Court's holding of no contract is affirmed.

■   The second issue raised by Glacier concerns the existence of consideration for the June 29 written contract. It is well settled that a promise to perform an existing legal obligation cannot constitute consideration for a contract. *Rickett v. Doze* (1979), 184 Mont. 456, 603 P.2d 679, 680. Glacier asserts this rule applies here. It contends that the Keils were obligated to provide the pump for Glacier's use under an oral contract formed before the execution of the June 29 written contract. Glacier contends that agreeing to provide the pump cannot, therefore, be consideration for the written contract. Glacier argues that since the written contract was based solely on the Keils duty to provide the pump, the contract fails for lack of consideration.

■   The problem with Glacier's argument on this issue is obvious given the resolution of the first issue raised here. The District Court properly found that no oral agreement existed between the Keils and Glacier before the execution of the June 29 written contract. Without such an agreement, the Keils had no legal duty to provide the pump to Glacier. Agreeing to provide the pump, therefore, could and did constitute consideration for the written contract. The contract is not void for lack of consideration. We will not overturn the District Court's judgment based on Glacier's contentions on this issue.

■   The final issue Glacier raises involves the invalidation of the June 29 agreement because of duress or undue influence. The formation of a contract requires the free and mutual consent of the parties to the contract. Section 28-2-301, MCA. Consent is not free when obtained through duress or undue influence. Section 28-2-401(1)(a), (d), MCA. Glacier contends the facts here show that Mr. Hummel did not freely consent to the terms of the June 29 written contract. It asserts Mr. Keil forced Mr. Hummel to sign the contract under the threat of removal of the pump and the resulting loss of the water supply to the community of East Glacier. Without Mr. Hummel's free and mutual consent, Glacier argues, the contract is invalid and should not be enforced.

The District Court found that at the time the parties executed the

June 29 written agreement Mr. Keil did not threaten to remove the pump. Based on that finding, the District Court concluded that Mr. Hummel executed the contract freely and voluntarily and not under any duress.

As stated above, this Court will not disturb the decision of the District Court on appeal where substantial evidence to support the judgment appears on the record. *McGuire v. American Honda Co.*, supra, 173 Mont. at 177, 566 P.2d at 1127. Further, the Court should view the evidence in a light most favorable to the prevailing party at the trial level. *Knight and Co. v. Manaras*, supra, 603 P.2d at 676, 36 St.Rep. at 2150.

Under this standard, there appears to be substantial evidence on the record to support the finding that Mr. Keil did not threaten to remove the pump and the conclusion that Mr. Hummel freely signed the contract. Mr. Keil testified that he did not threaten to remove the pump unless the June 29 agreement was signed. Mr. Stanley Hould, a business associate of Mr. Keil, who was present during the June 29 meeting, also stated Mr. Keil did not threaten to remove the pump during the meeting. The testimony of Mr. Hummel and his secretary, Emily Moke, conflicts with that of Mr. Keil and Mr. Hould. However, the District Court's findings show the court found the Keil and Hould testimony more credible than that of Hummel and Moke. On appeal we must rely on the judgment of the trial court as to the credibility of witnesses. Rule 52(a), M.R.Civ.P.; *Knight*, supra, 603 P.2 at 677, 36 St.Rep. at 2150-2151.

The testimony of Keil and Hould represents substantial evidence on the record to support the findings and conclusions of the District Court that Mr. Hummel was not threatened and freely signed the June 29 contract. Accordingly, we will not disturb the District Court's findings on this issue.

Affirmed.

MR. CHIEF JUSTICE HASWELL, and JUSTICES SHEA and SHEEHY, concur.