[No. B116535. Second Dist., Div. Five. Dec. 3, 1998.]

JONATHAN LANGE et al., Cross-complainants and Respondents, v.
TIG INSURANCE COMPANY et al., Cross-defendants and Appellants.

1180

**COUNSEL**

Horvitz & Levy, Barry R. Levy, Lisa Perrochet, John A. Taylor, Jr.; Parker, Milliken, Clark, O'Hara & Samuelian, Claire D. Johnson, William V. McTaggart, Jr., and James G. Faust for Cross-defendants and Appellants.

Lurie & Zepeda, Andrew W. Zepeda and L. Kimberly Pepper for Cross-complainants and Respondents.

## OPINION

**GODOY PEREZ, J.**—Appellants TIG Insurance Company, TIG Insurance Company of Michigan, TIG Specialty Insurance Company, and TIG Premier Insurance Company (collectively TIG) appeal from the judgment entered for respondents Jonathan Lange and Denise DiPietro on respondents' claims for promissory estoppel and negligent interference with prospective economic advantage. After review, we reverse and enter judgment for appellants.

### PROCEDURAL AND FACTUAL BACKGROUND

Artisan Contractors Association (ACA) is an association of building contractors providing various services to its members. In 1989, ACA started a pooling program to allow its members to buy liability insurance at competitive rates from various insurers. In 1992, ACA appointed EVE Insurance Brokerage (EVE) to administer the program and oversee the independent insurance brokers who worked directly with ACA members in procuring insurance policies. Respondents were two such brokers. In their capacity as brokers, respondents were permitted to submit to EVE their clients' applications for coverage under the ACA program.

In November 1993, appellant TIG entered into a written general agency agreement with EVE and began selling liability policies under the ACA program. Under the agreement, TIG authorized EVE to issue and deliver TIG insurance policies to the independent brokers, who then sold the policies to their clients. In return, EVE collected the policy premiums, which, under the agency agreement, EVE was obligated to hold in a segregated trust account until forwarded to TIG. The agreement further provided TIG could terminate EVE's agency authority immediately for cause and after 90 days' notice if without cause.

EVE encouraged the brokers to sell TIG policies. Between November 1993 and April 1996, respondents sold more than $9 million in policies, representing a substantial part of their business, and by 1996 practically all the policies sold under the ACA program were TIG policies.

In January 1996, TIG audited EVE's operations. It discovered EVE had not kept premiums owed to TIG in a segregated account, and that $438,412.85 in premiums was missing. It further discovered EVE had been issuing policies which did not comply with TIG's underwriting guidelines establishing the risks TIG was willing to insure. Following the audit, TIG exercised its right of termination in a letter dated March 8, 1996, giving EVE 90 days' notice of its termination as TIG's general agent effective July 6, 1996.

Following the notice of termination, ACA's president sent a letter dated March 14, 1996, to all of EVE's independent brokers, including respondents, falsely telling them TIG was having financial problems and informing them TIG "wrote EVE a letter saying that they won't write new business after 7/6 but California law requires them to offer a renewal for a year or possibly two without any change in rates." When TIG learned of this letter, it sent its own letter to the brokers on March 21, 1996, correcting the falsehoods about its financial condition but confirming it was terminating EVE, the letter stating "TIG has served notice of termination of its General Agency Agreement on EVE effective July 6, 1996."

Respondents understood that single sentence in the March 21 letter—"TIG has served notice of termination of its General Agency Agreement on EVE effective July 6, 1996"—to constitute a binding promise by TIG to allow EVE to continue selling TIG policies until July 6, 1996, in keeping, they claimed, with the insurance industry custom of providing agents at least 90 days' notice of an insurance program's termination. Relying on TIG's purported promise and their perceived ongoing authority to sell policies until July 6, respondents continued in the following days to solicit as much new business as possible, advertise their ability to sell TIG policies, and provide price quotes good for 30 days, and refrained from "rushing out to find a new product or interest a new insurance carrier" to replace TIG policies after the looming cutoff.[1] While respondents continued doing business as they had before, EVE failed to correct the problems discovered in TIG's audit; namely, replacing the nearly half-million dollars in missing premiums and implementing changes in underwriting guidelines. Consequently, TIG notified EVE on April 1, 1996, that the agency agreement was being terminated immediately for cause.

After being told of its immediate termination, EVE delayed informing its brokers, waiting eight days until April 9, 1996, to send them a letter telling them they could no longer sell TIG policies. Learning of the delay, TIG sent a letter to the brokers three days later stating EVE should have informed them about its termination earlier than it did, but, as an accommodation to the brokers, TIG would accept applications for new policies submitted before EVE made its tardy announcement. The same day TIG agreed to accept late applications, EVE also finally informed the brokers of changes to underwriting guidelines implemented by TIG in February.

Because of EVE's almost total dependence on TIG policies, it had no other policies to provide the brokers, including respondents, when it was

[1]Respondents explained they additionally refrained from seeking a replacement insurance program because they did not believe any other program suitable for their clients' needs existed.

terminated. Losing clients because of their inability to sell new TIG policies and the change in underwriting guidelines affecting policy renewals, respondents threatened TIG with legal action if TIG did not allow respondents to continue selling new policies until July 6, 1996, and repeal its underwriting changes. Respondents' theory was they had a "third party contractual relationship" with TIG despite having had no direct dealings or contractual relationship. TIG replied to respondents' threats by filing a complaint for declaratory relief in May 1996, seeking a judgment that respondents were not third party beneficiaries of the agency agreement with EVE and had no greater rights than did EVE as to that agreement.[2]

Respondents countered with the operative cross-complaint here containing causes of action for promissory estoppel and negligent interference with prospective economic advantage. They alleged TIG should be estopped from terminating EVE's agency agreement before July 6, 1996, because TIG's March 21 letter stating "TIG has served notice of termination of its General Agency Agreement on EVE effective July 6, 1996" was a binding promise TIG would not cancel EVE's general agency authority before July 6. Respondents further alleged TIG was liable for negligent interference with prospective economic advantage because it had breached its duty of care to respondents by failing to provide them at least three months' notice of termination of EVE's agency agreement. As damages, respondents claimed injury to their business reputation resulting from their inability to honor their 30-day quotes and economic losses flowing from lost commissions and brokers' fees which they would have earned on new policies and policy renewals between April 1 and July 6, 1996.

Trial was to a jury. At the close of evidence, the court instructed the jury that TIG had "a duty of care to give [respondents] reasonable notice prior to terminating their ability to sell new and renewal insurance polices" under respondents' second cause of action for negligent interference. The court told the jury that it need merely determine what constituted reasonable notice, whether TIG gave such notice, and respondents' damages, if any. The court further instructed that TIG was liable as a matter of law under respondents' promissory estoppel theory but that the court would determine respondents' damages under that theory. After deliberating, the jury found for respondents on negligent interference and awarded Lange $211,017 and DiPietro $157,936. The court thereafter calculated respondents' damages for promissory estoppel as $456,560 for Lange and $337,413 for DiPietro and entered judgment for respondents in those larger amounts and awarded them costs. This appeal followed.

---

[2]TIG later dismissed this complaint during trial.

### Standard of Review

■ "Appellate review of the trial judge's interpretation of a contract or other writing is governed by three rules: (a) Where extrinsic evidence has been properly admitted and the evidence is in conflict, any reasonable construction by the trial judge will be upheld under the general rule of conflicting evidence. (b) Where no competent extrinsic evidence has been introduced, the interpretation is derived solely from the terms of the instrument, the question is one of law, and the appellate court will give the writing its own independent interpretation. (c) Where competent extrinsic evidence has been introduced but it is not in conflict, the trial judge's inferences from it are not binding on the appellate court; as in the second situation, supra, the appellate court will make an independent determination of the meaning. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 681, p. 615; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].)

We independently review whether a duty of care existed for respondents' negligent interference claims. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

### Discussion

*Promissory Estoppel*

■ Promissory estoppel applies whenever a "promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance" would result in an "injustice" if the promise were not enforced. (Rest.2d Contracts, § 90, subd. (1).) To be binding, the promise must be clear and unambiguous. (*Laks* v. *Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 890 [131 Cal.Rptr. 836] [among the "required elements for promissory estoppel . . . are (1) a promise clear and unambiguous in its terms"]; *Thomson* v. *Internat. Alliance of Stage Employes* (1965) 232 Cal.App.2d 446, 454 [42 Cal.Rptr. 785] [" 'promise [must be] clear and unambiguous in its terms' "]; *Van Hook* v. *So. Cal. Waiters Alliance* (1958) 158 Cal.App.2d 556, 570 [323 P.2d 212] [same]; *Graddon* v. *Knight* (1956) 138·Cal.App.2d 577, 583 [292 P.2d 632] [same]; *Columbia Pictures Television* v. *Krypton Broadcasting of Birmingham, Inc.* (9th Cir. 1997) 106 F.3d 284, 292, revd. on other grounds in *Feltner* v. *Columbia Pictures Television, Inc.* (1998) 523 U.S. 340 [118 S.Ct. 1279, 140 L.Ed.2d 438] [same]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 249, at p. 251 ["The doctrine is inapplicable where no clear promise is made."]; see also *Lohse* v.

*Atlantic Richfield Co.* (N.D. 1986) 389 N.W.2d 352, 357 [comparing states such as California where the promise must be clear and unambiguous to states which impose no such requirement].)

■ Here, TIG's March 21 letter stated "TIG has served notice of termination of its General Agency Agreement on EVE effective July 6, 1996." Respondents claim that statement constituted a binding promise EVE would not be terminated under any circumstances before July 6, despite provisions in the agency agreement between TIG and EVE which allowed for immediate termination with cause. We reject respondents' claim because we cannot find in TIG's letter a promise of any sort, let alone a promise of sufficient definitiveness and clarity, to justify applying promissory estoppel. The statement was simply a true recitation of historical fact—notice of termination had been served and would take effect on July 6. Accordingly, the trial court erred in finding the doctrine applied.

Respondents' reliance on extrinsic evidence to support their interpretation undermines their claim. They note that the "trial court considered a substantial amount of extrinsic evidence to assist it to determine whether the March 21 letter to Lange & DiPietro constituted a promise." Such evidence included, among other things, the fact that the March 21 letter was written by TIG's chief financial officer, TIG knew the letter conveyed information important to EVE's independent brokers, the letter was the first direct communication ever between respondents and TIG, and respondents perceived the letter as conforming to an insurance industry custom of providing 90 days' notice of a program's termination. Extrinsic evidence is relevant, however, in interpreting a written instrument only if the instrument's language is ambiguous. (See, e.g., Civ. Code, § 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit . . . ."]; *Appalachian Ins. Co.* v. *McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 12 [262 Cal.Rptr. 716] ["Extrinsic evidence may be introduced when the terms of the contract are ambiguous."].) It follows that if extrinsic evidence is needed to interpret a promise, then obviously the promise is not clear and unambiguous.

Apparently conceding that the March 21 letter did not contain an express promise to allow EVE to operate as TIG's agent until July 6 no matter what, respondents fall back to arguing promissory estoppel should apply because TIG's letter deliberately concealed that TIG had reserved its contractual right to terminate EVE immediately for cause. Respondents, who were strangers to the contract between EVE and TIG, thus place themselves in the position of claiming TIG unilaterally waived a significant contractual right—its power to terminate EVE immediately for cause—with the mere

words "TIG has served notice of termination of its General Agency Agreement with EVE effective July 6, 1996." To state the position is to reveal its untenability. In any event, failure to inform is not a promise and certainly unsaid words cannot form a clear and unambiguous promise.

Finally, respondents' contention that the words "I promise" need not be uttered for promissory estoppel to apply misses the mark. First, TIG does not so contend, instead correctly noting that whatever the words of the alleged promise, they must be clear and unambiguous. Second, the decisions respondents cite for their proposition in fact support TIG: *Wade* v. *Markwell & Co.* (1953) 118 Cal.App.2d 410 [258 P.2d 497, 37 A.L.R.2d 1363], applied promissory estoppel where the defendant pawnbroker told the plaintiff she had one week to redeem her mink coat but then sold the coat before week's end (*id.* at pp. 419-420), and *Graddon* v. *Knight, supra,* 138 Cal.App.2d 577, estopped the defendant bank from denying it had promised to obtain fire insurance for a homeowner after a bank officer asked the homeowner if he wanted full insurance coverage and the homeowner said yes. (*Id.* at p. 582.) In both decisions, the defendant's promise was far clearer than the purported promise here.[3]

*Negligent Interference With Prospective Economic Opportunity*

█ " 'The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care.' [Citation.]" (*LiMandri* v. *Judkins* (1997) 52 Cal.App.4th 326, 348 [60 Cal.Rptr.2d 539], italics omitted.) As Professor Witkin explained, among the criteria for establishing a duty of care is the "blameworthiness" of the defendant's conduct. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 661, p. 755; see also *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 805 [157 Cal.Rptr. 407, 598 P.2d 60].) For negligent interference, a defendant's conduct is blameworthy only if it was independently wrongful apart from the interference itself. (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 392-393 [45 Cal.Rptr.2d 436, 902 P.2d 740] [". . . a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.' "]; *National Medical Transportation Network* v. *Deloitte & Touche* (1998) 62 Cal.App.4th 412, 439-440 [72 Cal.Rptr.2d 720] [the independently wrongful requirement applies to negligent interference claims].)

█ Here, TIG merely exercised its contractual right of termination. Apart from the disruption caused by terminating EVE, TIG did not interfere

---

[3]Because we find no clear and unambiguous promise, we need not address TIG's contention that promissory estoppel applies only when the promisee reasonably relies to its detriment on the promise, and that no such detrimental reliance occurred here.

with respondents' businesses. Thus, no independently wrongful conduct occurred. (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th at pp. 408-410 (conc. opn. of Mosk, J.) [independent wrongfulness is "independently tortious means" or otherwise illegal conduct].) Accordingly, TIG owed respondents no duty of care and the trial court erred in instructing the jury otherwise.

TIG's failure to provide longer notice to respondents before terminating EVE cannot establish wrongfulness. TIG's purported obligation to give respondents reasonable notice—which was the obligation upon which the court found TIG's duty of care—was derived from the insurance industry custom of insurers giving a minimum 90 days' notice to *their* agents of termination of the insurers' *own* insurance programs. As respondents' insurance industry expert testified, "[W]hen a company creates a program for their agents and those agents have had to spend considerable amount of time and money to push those programs that it is the duty and custom of that company to try and stay in that business, and if they can't to at least give those agents sufficient time to find other markets to cover that business because you don't create another program overnight. [¶] And I have commented that I think the normal time would be 6 months, absolute minimum of 3 months . . . ." This custom did not apply here, however, because TIG did not create the insurance program under which respondents were selling policies—ACA did—and it was undisputed respondents were not TIG's agents. Moreover, respondents' argument is circular. A duty of care rests on, among other things, blameworthy conduct, but here respondents are attempting to bootstrap TIG's failure to provide advance notice as the blameworthy conduct which created a duty of care to provide notice.

Also unavailing is respondents' contention TIG never proved at trial that it had cause to terminate EVE, TIG instead having terminated EVE as part of TIG's realignment of its operations designed to withdraw from unprofitable lines of business in order to focus on more profitable ventures. Respondents' contention fails, however, because they concede EVE did not maintain a segregated trust account and did not enforce TIG's underwriting guidelines, both of which were obligations under the agency agreement. Accordingly, to the extent TIG did not offer evidence it had cause to terminate EVE, it did not need to do so because no one disputed such cause existed.

In any event, to what end is respondents' contention? They cite no authority that it is improper for a business to try to maximize its profits, for that is how a competitive market economy works—companies abandon unprofitable lines of business in order to pursue better opportunities elsewhere. Indeed, the trial court itself rejected respondents' argument, as the

following shows: "[Respondents' counsel]: The 5th factor [under *J'Aire* in finding a duty of care] is the moral blame attached to TIG's conduct. We have heard about TIG's corporate reorganization plan, how they were chasing the almighty dollar to the [n]th degree. Your Honor, it's just plain wrong. It's just plain wrong to make a profit at the expense of others. It's just plain wrong to break a promise. Every society on this globe recognizes that it is wrong to break a promise, and that's what [appellant] did here. It's morally wrong. [¶] THE COURT: It's not wrong for them to make a profit, is it? [¶] [Respondents' counsel]: No, it's not wrong for them to make a profit, and I am not here advocating TIG has no right to make a profit. I'm here saying they have no right to make a profit without consideration of the promises that they have made and the harm that their actions will cause to these brokers. These brokers weren't asking TIG to continue with this program past July 6. [¶] THE COURT: I understand that. Just when you said they're chasing the almighty dollar, that's what you do in a capitalistic country, and that's what businesses do is chase the almighty dollar."

Finally, respondents' contention that they need not show TIG engaged in wrongful conduct when they allege negligent, as opposed to intentional, interference with prospective economic advantage is incorrect. In support, they cite *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], but do not mention that it was on precisely this point that *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th 376—which articulated the independently wrongful requirement—overruled *Seaman's. (Id.* at p. 393, fn. 5 ["To the extent that language in . . . *Seaman's, supra,* 36 Cal.3d 752, addressing the pleading and proof requirements in the economic relations tort is inconsistent with the formulation we adopt in this case [requiring wrongful conduct independent of the interference itself], it is disapproved."].) The other decisions respondents cite offer them no greater support. *North American Chemical Co.* v. *Superior Court* (1997) 59 Cal.App.4th 764 [69 Cal.Rptr.2d 466] involved negligent performance of a professional services contract and whether the existence of a contract precludes tort remedies when the contract is negligently performed. In discussing the elements of negligent interference, the court there noted "wrongful conduct" was subsumed within imposition of a duty of care. (*Id.* at pp. 774, 785-787.) And *Keru Investments, Inc.* v. *Cube Co.* (1998) 63 Cal.App.4th 1412 [74 Cal.Rptr.2d 744], was a construction defect case where the court noted that one of the factors that must be considered in determining whether someone owes a duty of care to a third party is the "moral blame attached" to the person's conduct. (*Id.* at pp. 1418-1419.)

## DISPOSITION

The judgment and order awarding costs are reversed and the trial court is directed to enter judgment in favor of TIG Insurance Company, TIG Insurance Company of Michigan, TIG Specialty Insurance Company, and TIG Premier Insurance Company. Appellants to recover their costs on appeal.

Turner, P. J., and Grignon, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 9, 1999.