[No. G033867. Fourth Dist., Div. Three. June 28, 2005.]

CALFARM INSURANCE COMPANY, Plaintiff, Cross-defendant and Appellant, v.
TADEUSZ KRUSIEWICZ et al., Defendants, Cross-complainants and Respondents.

COUNSEL

Horvitz & Levy, Mitchell C. Tilner, Peter Abrahams; Korshak, Kracoff, Kong & Sugano, T. R. Sugano and Robert Montes, Jr., for Plaintiff, Cross-defendant and Appellant.

Shields Law Offices, Jeffrey W. Shields and Rick A. Varner for Defendants, Cross-complainants and Respondents.

OPINION

FYBEL, J.—

## INTRODUCTION

CalFarm Insurance Company (CalFarm) appeals from a punitive damage award of $1,457,080 in favor of Tadeusz and Betty Krusiewicz (the Krusiewiczes) and a declaratory judgment holding CalFarm was obligated to pay the full amount of a binding arbitration award against CalFarm's insured. The Krusiewiczes are not CalFarm's insureds. Rather, the Krusiewiczes sued CalFarm for failing to pay a judgment they secured against Laynescape, Inc. (Laynescape), which constructed retaining walls on the Krusiewiczes' property. Laynescape failed to properly seal the retaining walls, permitting water to permeate the walls and damage the walls' exterior paint. Laynescape did not paint the retaining walls. CalFarm insured Laynescape under a policy covering damage to the paint, but containing a standard provision excluding from coverage the cost to repair the insured's faulty or defective work.

In support of reversal, CalFarm argues: (1) the Krusiewiczes lack standing to sue CalFarm for bad faith, and *Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847 [29 Cal.Rptr.2d 258] (*Hand*), on which the Krusiewiczes assert standing, was incorrectly decided; (2) the CalFarm policy did not cover the cost of removing and replacing backfilled dirt and landscaping, which was necessary to reseal the retaining walls; (3) the evidence did not support the jury's finding that CalFarm was estopped to deny a promise to pay the full amount of the binding arbitration award; (4) CalFarm's denial of coverage was objectively reasonable and CalFarm did not otherwise act in bad faith; (5) there was no clear and convincing evidence CalFarm acted with malice, fraud, or oppression; and (6) the punitive damages are excessive.

We conclude the evidence supported the jury's finding of estoppel and, therefore, CalFarm was obligated to pay all but a small portion of an arbitration award against CalFarm's insured and in favor of the Krusiewiczes.

We reverse the punitive damages, however, because promissory estoppel cannot support punitive damages and because CalFarm's denial of coverage under the policy was objectively reasonable under the unsettled nature of the law. In light of these conclusions, we do not reach the other issues.

The dissent asserts that under *Hand, supra,* 23 Cal.App.4th 1847, the Krusiewiczes became third party beneficiaries of the insurance contract, entitling them to the rights of the insured, including the right to recover punitive damages for bad faith. For purposes of this opinion, we presume *Hand* applies and, consequently, the Krusiewiczes stand in the insured's shoes with respect to recovery for bad faith liability. But CalFarm could not be liable for bad faith if its coverage decision under the insurance policy was objectively reasonable. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346–347 [108 Cal.Rptr.2d 776].) Based on the extensive legal analysis set forth below, we conclude CalFarm's coverage decision was objectively reasonable. The dissent argues the objectively reasonable standard was a question of fact decided by the jury. The objectively reasonable standard is based on an analysis of case law and is a legal question, not a factual one. In any event, the jury did not decide this issue. Finally, the dissent's legal analysis of the cases serves only to make the point that reasonable minds differ as to whether the insurer's legal position was objectively reasonable. Thus, the insured could not recover for bad faith against CalFarm. Since the insured could not recover for bad faith under the insurance policy, *Hand* does not permit the Krusiewiczes to recover for bad faith either.

The Krusiewiczes did not sue CalFarm for breach of an agreement to arbitrate; they sought to enforce the arbitrator's award against CalFarm under a claim of promissory estoppel, not breach of contract or bad faith breach of an insurance contract. The pertinent issue in assessing bad faith is whether CalFarm's assessment of coverage *under the contract of insurance* was objectively reasonable. In contrast, the Krusiewiczes' claim of promissory estoppel was based upon representations made by CalFarm at a settlement conference regarding an agreement to arbitrate, not the terms of an insurance contract. The dissent argues that the insurance contract was amended by the agreement to arbitrate and therefore supports an action for bad faith. There was never an argument in the trial court that the insurance contract was so amended and it was not.

Punitive damages are not recoverable under a claim of promissory estoppel. The Krusiewiczes sought punitive damages only on their bad faith breach of insurance contract cause of action and do not contend they can recover punitive damages under their promissory estoppel claim. The dissent cites no

authority permitting recovery of punitive damages under a theory of promissory estoppel or under the dissent's theory of bad faith breach of an agreement to arbitrate by amendment. No such authority exists and we are not convinced it should.

## FACTS

### I. *Laynescape Fails to Properly Seal Retaining Walls It Constructed on the Krusiewiczes' Property.*

In April 1996, the Krusiewiczes hired Laynescape to perform extensive landscaping work on their property, including the construction of thousands of feet of retaining walls. The Krusiewiczes hired another contractor to paint the exterior of the retaining walls. Behind the retaining walls, soil was backfilled, and irrigation systems and landscaping were installed by Laynescape and other contractors.

Because Laynescape failed to apply the proper number of coats of sealant to the back of the walls, water seeped through the walls and caused the paint on the exterior side to blister and peel. Repainting the walls alone would not prevent future damage. To prevent paint damage from reoccurring, the back of the walls had to be resealed, which required removing the backfilled soil and landscaping, and replacing the soil and landscaping after the walls had been resealed. The Krusiewiczes claimed the remedial costs were $712,844, including $533,762 to remove and replace the backfilled soil and landscaping.

### II. *CalFarm Accepts Laynescape's Tender of Defense Subject to a Reservation of Rights.*

The Krusiewiczes sued Laynescape and its owner, Layne Kubo, for breach of contract, negligence, fraud, and unfair competition. Laynescape and Kubo tendered their defense to CalFarm, which had insured Laynescape under a "special multi-peril" policy (the Policy). The Policy insured Laynescape against liability for property damage caused by the insured, but excluded coverage for damage "to that particular part of any property, not on premises owned by or rented to the *insured*, [¶] . . . [¶] . . . the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the *insured*." In other words, the Policy provided coverage for damages to the work product of others caused by the insured, but excluded coverage for damages to the work product of the insured and for the costs of repairing the insured's defective work.

In a letter dated May 1, 2001, CalFarm notified Laynescape and Kubo that CalFarm agreed to provide them with a defense through Attorney Douglas DeGrave of the firm of Parker Stanbury, with a reservation of rights to contend the Policy did not cover some causes of action.

In a letter dated May 31, 2001, CalFarm's coverage attorney, Ralph Laird, explained the only basis for potential coverage was "the allegation of damage to the paint on the exterior of the subject retaining wall." The Laird letter further explained, "CalFarm denies that it has any obligation to indemnify you . . . for any liability imposed against you other than for property damage to the property or work of others" and, therefore, "there is no potential coverage under the insurance policy for repair or replacement of the retaining wall."

James Aleschus, a CalFarm litigation specialist, had been assigned to handle Laynescape's claim. As early as May 2001, Aleschus believed coverage existed under the Policy to repair the damage to the paint on the retaining walls. Aleschus made a note in the claim file on October 6, 2001, that "[o]ur expert says the repair should be to drill weep holes at the bottom of the walls to let the water out, sand blast and repai[n]t," at a total cost to repair of $73,459.20.

### III. *CalFarm Assesses Coverage Under the Policy in Light of Laynescape's Admission of Fault.*

Kubo admitted during his deposition on October 22, 2001, he had failed to apply three coats of sealant to the retaining walls as the architectural plans required. DeGrave advised Aleschus that in light of Kubo's deposition testimony, "[i]t is now clear that the insured was negligent in his construction of the walls. That negligence has caused resulting damage in the form of peeling paint. We must determine the proper repair method. In light of the facts as we now know them, simply boring weep holes into the walls would be inappropriate. [¶] I have instructed our expert to immediately provide us with a new cost of repair estimate."

On October 23, 2001, after receiving DeGrave's report, Aleschus noted in the claim file: "This makes a huge difference. We know water behind the walls is passing thru and causing the paint to peel. To repair this it will be necessary to remove all the plants, dig out the wall, seal it, then return the dirt and plants. Plaintiff['s] est[imate] is [$]500,000+. [¶] To assist us on the coverage issue I called our coverage att[orne]y and asked him if we have

indemnity coverage for the cost to tear out the plants and dirt to get to the wall. I know the cost to put on the sealant is not covered, but that would be only a small part of the repair costs." Later the same day, Aleschus noted in the claim file, "I've asked for additional coverage analysis, but it is my understanding the language of the L9001 form excludes only the cost to put the sealant on while the 'get to' damages are covered. [¶] This is an initial 'heads up.' "

On October 26, 2001, Aleschus noted in the claim file that Laird "remains of the opinion that the 'get to' damages are excluded while the damage to the paint is covered." One week later, on November 2, 2001, Laird sent a letter to Laynescape stating that while CalFarm would continue to defend pursuant to the May 31, 2001 letter, CalFarm denied "any duty to indemnify Laynescape or Mr. Kubo for repair costs associated with anything but the repair of the paint to the exterior of the retaining wall." Accordingly, Laird wrote, "[a]ll expenses associated with the application of the sealant, installation of drains and related construction activities necessary to perform those repairs are not covered by the subject policy." Aleschus testified that conclusion was "consistent with the position" he had always taken.

### IV. *A Settlement Conference Results in an Agreement for Binding Arbitration.*

A settlement conference was held on November 16, 2001. The Krusiewiczes, their attorney (Philip Smith), the insured, its *Cumis*[1] counsel, Aleschus, and DeGrave attended. When no settlement was reached, Smith and DeGrave discussed proceeding by binding arbitration. Smith told DeGrave the Krusiewiczes "were insistent" CalFarm agree to pay any arbitration award within 10 days. DeGrave rejected that proposal, but after speaking with Aleschus, told Smith: "What we can do is we can provide in the arbitration stipulation that there will be a general verdict, and the general verdict can be in the form of a specific dollar amount for repair of the retaining walls, . . . that way, the insurance company will have no choice but to pay the award."

Later that day, outside of Aleschus's presence, DeGrave told the Krusiewiczes the general verdict was a "great idea" and in their "best interest" because "[t]he insurance company will have no choice [but] to pay if the general verdict is issued by the arbitrator" and "the general verdict would be the only way that CalFarm would pay for the damages in this . . . cause." The Krusiewiczes believed DeGrave represented both CalFarm and its insured because earlier in 2001 he had been introduced to them as

[1] *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494].

CalFarm's attorney, and because during the settlement conference DeGrave appeared to be acting on CalFarm's behalf.

In return for Laynescape's agreeing to binding arbitration, the Krusiewiczes agreed to dismiss their claims for overpayment (which had a potential value of about $60,000), negligence per se, and unfair competition. Aleschus agreed to the terms of the binding arbitration agreement on behalf of CalFarm. As a result, Aleschus believed liability was no longer an issue—the only issue was the cost of repair.

## V. *The Arbitrator Awards the Krusiewiczes a Lump Sum of $475,000 Against Laynescape; CalFarm Declines to Pay All but $80,000.*

The arbitrator made a lump sum award of $475,000 for "remediation and compensatory damages" in favor of the Krusiewiczes and awarded them $129,082.96 in attorney fees. On March 20, 2002, judgment was entered on the arbitration award. On that same date, CalFarm brought this lawsuit against the Krusiewiczes for declaratory relief and reimbursement.

CalFarm paid the Krusiewiczes $80,000 of the damages awarded and all the costs and attorney fees. CalFarm based the $80,000 on the cost of sandblasting and repainting the exterior of the retaining walls.

CalFarm declined the Krusiewiczes' demand to pay the balance of the arbitrator's award. In a letter dated April 15, 2002, from Laird to the Krusiewiczes' attorney, CalFarm "acknowledge[d] its responsibility to indemnify Laynescape with respect to the cost to repair and repaint the exterior of each retaining wall damaged by the inadequate seal job," but contended those costs "may be approximately $15,000." The letter continued: "CalFarm recognizes that there may be other costs associated with the repainting of the walls, as well as costs for removal or replacement of work not performed by Laynescape, and in light of this and CalFarm's prior offer to compromise this matter in the underlying case, CalFarm will in good faith pay $80,000, which may actually exceed the actual amount of covered property damage. If the repair work (or repainting for that matter) will necessitate the removal or replacement of other contractor's work (as opposed to Laynescape's), we ask that you identify such work and the costs claimed for such removal or replacement so that CalFarm may evaluate those claims."

In an April 26, 2002 letter to the Krusiewiczes' attorney, Laird stated the $80,000 payment "probably exceeds the actual amount of covered property damage in this matter" but "CalFarm is paying it in good faith, recognizing that the cost to repair or replace the exterior paint of the retaining walls is at least $15,000 (as indicated by plaintiffs' expert) plus related costs including the cost to remove or replace work of others that must necessarily be disturbed in order to repair Laynescape's defective work. As to this latter item, while CalFarm does not concede that such costs are covered by the terms of the policy, it is willing to consider them, and we invite you to identify those costs so that CalFarm may evaluate them, even to the extent you contend such costs exceed $80,000."

### PROCEEDINGS IN THE TRIAL COURT

CalFarm's complaint alleged CalFarm could not determine what portion of the arbitrator's award fell within CalFarm's duty to indemnify because the award was not itemized. CalFarm sought a declaration as to what portion of the arbitration award CalFarm was obligated to pay on behalf of its insured.

The Krusiewiczes and Laynescape filed cross-complaints against CalFarm. The Krusiewiczes' cross-complaint asserted causes of action against CalFarm for bad faith breach of insurance policy, breach of written contract, declaratory relief, and promissory estoppel/waiver. The Krusiewiczes alleged CalFarm was obligated to pay the entire arbitration award because either the award was covered by the Policy, or DeGrave's statements at the settlement conference obligated CalFarm to pay the entire arbitration award under theories of waiver and of estoppel. The Krusiewiczes sought punitive damages under only the bad faith breach of insurance policy cause of action.

The case was bifurcated and the coverage issue tried to the court. The trial court ruled the Policy covered all of the remedial costs, except for the cost for additional coats of sealant (later agreed to be $8,000). After the trial court issued its coverage decision, CalFarm paid the Krusiewiczes $460,622.42, representing the balance of the arbitration award plus interest.

The Krusiewiczes' cross-complaint was tried to a jury. (CalFarm settled Laynescape's bad faith cross-complaint). The jury returned a special verdict finding: (1) DeGrave was acting as an agent for CalFarm with the authority to bind CalFarm; (2) DeGrave said that if the arbitrator rendered an award in the form of a general verdict, CalFarm would have no choice but to pay the award; (3) DeGrave's statement bound CalFarm to pay the award; (4) the

Krusiewiczes reasonably relied on DeGrave's statement; (5) CalFarm unreasonably delayed payment of policy benefits; (6) CalFarm's delay in paying policy benefits was a substantial factor in causing harm to the Krusiewiczes; (7) CalFarm's conduct was "malicious, oppressive, despicable or fraudulent to justify the awarding of punitive damages"; and (8) CalFarm's conduct was in bad faith and it was reasonably necessary for the Krusiewiczes to hire an attorney to recover policy benefits. Following a trial on the amount of punitive damages, the jury returned a second special verdict awarding the Krusiewiczes $1,457,080 in punitive damages.

After the parties stipulated that the cost of additional sealant required to reseal the wall was $8,000, the court deducted that sum from the jury's award and entered judgment against CalFarm for $1,449,080. A judgment reflecting the jury verdict and incorporating the trial court's coverage determination was entered on January 26, 2004.

The trial court denied CalFarm's motions for a new trial and for judgment notwithstanding the verdict, and CalFarm timely appealed.

ANALYSIS

I. *The Evidence Supports the Jury's Finding CalFarm Was Estopped to Deny Coverage for the Cost to Remove and Replace the Backfilled Dirt and Landscaping.*

The Krusiewiczes' claim of promissory estoppel is based upon representations made by CalFarm during the November 16, 2001 settlement conference. The Krusiewiczes asserted, based on those representations, CalFarm was estopped from denying a promise to pay the arbitrator's award.

■ The jury found DeGrave's statements made during the settlement conference on November 16, 2001, bound CalFarm to pay the full amount of the arbitration award. The Krusiewiczes argue we must affirm the verdict because it is supported by substantial evidence. "Generally, the determination of . . . estoppel is a question of fact, and the trier of fact's finding is binding on the appellate court. [Citations.] When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling. [Citations.]" (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319 [24 Cal.Rptr.2d 597, 862 P.2d 158].)

■ "Promissory estoppel applies whenever a 'promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or

forbearance' would result in an 'injustice' if the promise were not enforced. [Citation.] To be binding, the promise must be clear and unambiguous." (*Lange v. TIG Ins. Co.* (1998) 68 Cal.App.4th 1179, 1185 [81 Cal.Rptr.2d 39; see also 1 Witkin, Summary of Cal. Law (9th ed. 1987 & 2004 supp.) Contracts, § 249 ["The doctrine is inapplicable where no clear promise is made"].)

DeGrave's statements made during the November 16, 2001 settlement conference permit an inference of a clear and unambiguous promise arising to promissory estoppel. Smith, the Krusiewiczes' attorney, testified:

"A. . . . I had told Mr. DeGrave that one way to settle this matter, resolve it, was to proceed to an arbitration. I told him it had to be binding, and I told him that the Krusiewiczes were insistent that if it did go to arbitration, that any award that was issued by the arbitrator would have to be paid by the insurance company within 10 days. That's what they wanted. They wanted finality. They wanted it to be over with.

"Q. How did Mr. DeGrave respond to that?

"A. He either told me right then as we were talking about it or after a conversation with the insurance company that the insurance company would not agree to that. He told me that as a coverage attorney, I should know that they would not be in a position to make an absolute coverage determination that day while the MSC or the settlement conference was going forward, that that would have to come at a later time, so that they could not promise to pay as part of that—the stipulation, and that's how the general verdict came up.

"Q. Tell me what was said by Mr. DeGrave regarding the general verdict.

"A. After he talked to the insurance company, he came back to me, and he said, 'what we can do is we can provide in the arbitration stipulation that there will be a general verdict, and the general verdict can be in the form of a specific dollar amount for repair of the retaining walls,' and he said, 'that way, the insurance company will have no choice but to pay the award.' "

Mrs. Krusiewicz testified DeGrave "emphatically" told her "a general verdict would be in our best interest" because "the only way for us to arrive at a number to repair the damage to our walls would be for an arbitrator, who would independently look at the evidence to . . . ascertain . . . the problem, and the repair for that problem." Smith, the Krusiewiczes' attorney, testified that DeGrave said in Mrs. Krusiewicz's presence, "this was a deal that she should take, that this was a great idea, this idea of a general verdict." DeGrave told Mrs. Krusiewicz: "This is brilliant. The insurance company will

have no choice [but] to pay if the general verdict is issued by the arbitrator. Don't be foolish. Don't be stupid. This is the way to do it. There's no uncertainty. You should do this deal." DeGrave also said to Mrs. Krusiewicz that "in order for them to offer that to us, that we would give up the other causes of action that we had against Mr. Kubo."

In reliance on DeGrave's representations, the Krusiewiczes agreed to dismiss their claims for overpayment, negligence per se, and unfair competition. The overpayment claim alone had a potential value of about $60,000.

DeGrave's representations, including the statement CalFarm would have "no choice" but to pay the arbitrator's award if it was made in a general verdict, can be construed as a clear and unambiguous promise to pay the full amount of the arbitrator's award, which included the cost of removing and replacing the backfilled dirt and landscaping. The jury drew that inference, it is supported by the evidence, and we will not disturb it.[2]

CalFarm argues the Krusiewiczes could not have reasonably relied on DeGrave's statements because the Krusiewiczes were represented by counsel at the settlement conference. "Where one has been represented by an attorney in connection with a claim the necessary elements for estoppel are not established as a matter of law." (*Romero v. County of Santa Clara* (1970) 3 Cal.App.3d 700, 705 [83 Cal.Rptr. 758]; see also *Tubbs v. Southern Cal. Rapid Transit Dist.* (1967) 67 Cal.2d 671, 679 [63 Cal.Rptr. 377, 433 P.2d 169]; *Cal. Cigarette Concessions v. City of L.A.* (1960) 53 Cal.2d 865, 871 [3 Cal.Rptr. 675, 350 P.2d 715]; *Kunstman v. Mirizzi* (1965) 234 Cal.App.2d 753, 757 [44 Cal.Rptr. 707].) The Krusiewiczes, however, were not relying on DeGrave's legal opinion of coverage, but on DeGrave's promise CalFarm would pay the arbitrator's award ("will have no choice" but to pay) regardless of CalFarm's own coverage determination.

Although the jury's finding of estoppel supported an obligation for CalFarm to pay the arbitrator's award, estoppel will not support punitive damages. The Krusiewiczes do not contend otherwise; they did not seek punitive damages under their promissory estoppel cause of action. The implied covenant of good faith and fair dealing arises out of a contractual relationship and does not exist independently of its contractual underpinnings. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) "[T]he covenant is implied as a supplement to the express

---

[2] Smith conceded DeGrave did not specifically say "we will pay the judgment," because "[t]hat's what they wouldn't do." Smith testified DeGrave told him at the settlement conference that CalFarm could not make a coverage decision that day and therefore could not agree to pay the arbitrator's award. This testimony goes to the weight of the evidence and does not preclude a finding of a clear and unambiguous promise.

contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Promissory estoppel uses equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced. (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 310 [96 Cal.Rptr.2d 747, 1 P.3d 63].)

■ Here, promissory estoppel arises to enforce DeGrave's promise at the settlement conference that CalFarm would pay the full amount of the arbitrator's award, not to enforce the Policy terms. Since promissory estoppel here was based on a promise independent of the Policy's implied covenant of good faith and fair dealing, estoppel cannot support punitive damages.

## II. *CalFarm's Denial of Coverage to Indemnify for the Cost to Remove and Replace the Backfilled Dirt and Landscaping Was Objectively Reasonable.*

The trial court determined (1) the damaged paint constituted property damage covered under the Policy, and (2) CalFarm was obligated to indemnify its insured for all of the remedial costs reflected in the arbitrator's award, except for the cost of additional coats of sealant. Our analysis stops short of deciding whether the Policy required CalFarm to indemnify for the cost to remove and replace the backfilled dirt and landscaping because we conclude CalFarm's coverage decision was objectively reasonable in light of the unsettled nature of the law.

■ " 'The mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability.' [Citations.] Without more, such a denial of benefits is merely a breach of contract. Moreover, the reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors. [Citation.] [¶] Thus, before an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause.* [Citations.] However, when there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. [Citations.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at pp. 346–347.)

If the conduct of the insurer in denying coverage was objectively reasonable, its subjective intent is irrelevant. (*Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973–974 [135 Cal.Rptr.2d 718].) When the issue of the insurer's objective reasonableness depends on an analysis of legal precedent, reasonableness is a legal issue reviewed de novo. (*Id.* at p. 973 & fn. 1.) That is the situation here.

The Policy insures against bodily injury or property damage, meaning "[p]hysical injury to or destruction of tangible property which is caused by an *occurrence*." The term "occurrence" was defined in the Policy as "an accident, including continuous or repeated exposure to conditions, which results in . . . *property damage*." The Policy was later amended to define "occurrence" as "an accident which results in . . . *property damage* that first occurs during the policy period." Exclusion (A)(2)(d) under part VI of the Broad Form Comprehensive General Liability Endorsement of section II of the Policy excluded coverage for damage "to that particular part of any property, not on premises owned by or rented to the *insured*, [¶] . . . [¶] . . . the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the *insured*."

■ "Own work" and "work product" exclusions, such as exclusion (A)(2)(d) of the Policy, are standard in the standard form comprehensive general liability policy issued to a general contractor. (*Diamond Heights Homeowners Assn. v. National American Ins. Co.* (1991) 227 Cal.App.3d 563, 571–572 [277 Cal.Rptr. 906].) Under these comprehensive general liability policies, " '[t]he risk intended to be insured is the possibility that the . . . work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself.' " (*Western Employers Ins. Co. v. Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1031 [194 Cal.Rptr. 688].) "The courts, in interpreting liability insurance policies, have consistently differentiated between damage to the product of the insured, and damage to other property caused by that product." (*Economy Lumber Co. v. Insurance Co. of North America* (1984) 157 Cal.App.3d 641, 649 [204 Cal.Rptr. 135].)

The exclusion reflects the principle that the risk of replacing or repairing the insured's defective work or product is a commercial risk that is not passed on to the liability insurer. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 866 [93 Cal.Rptr.2d 364]; see also *F & H Construction v. ITT Hartford Ins. Co.* (2004) 118 Cal.App.4th 364, 373 [12 Cal.Rptr.3d 896] ["a liability insurance policy is not designed to serve as a performance bond [citation] or warranty of a contractor's product"]; *Maryland Casualty Co. v. Reeder* (1990) 221 Cal.App.3d 961, 967 [270 Cal.Rptr. 719] ["Generally liability policies . . . are

not designed to provide contractors and developers with coverage against claims their work is inferior or defective"].) Thus, "[t]he exclusion precludes coverage for liability for damage to and deficiencies of the insured contractor's work product. [The exclusion] applies to the insured's defective work as well as to the insured's satisfactory work that is damaged by the insured's defective work." (*Diamond Heights Homeowners Assn. v. National American Ins. Co., supra*, 227 Cal.App.3d at p. 571.)

As a result of the own product/own work exclusion, the Policy provided coverage for damages to the work product of others caused by Laynescape's work product, but excluded coverage for Laynescape's defective work product itself. No one disputes the damaged paint on the outside of the retaining walls constitutes such covered damages caused by the insured's work product. No one disputes the Policy requires CalFarm to pay for repairing the damaged paint. No one disputes such repair includes the removal of the damaged paint and repainting the outside of the retaining walls. Similarly, no one disputes the cost of the sealant and the cost to apply the sealant to the backside of the retaining walls are not covered as those costs are necessary to repair the insured's defective work product.

The question is whether the costs associated with removing the backfilled dirt and landscaping to gain access to the backside of the retaining walls (as well as the costs associated with replacing the dirt and landscaping after the walls are resealed) are part of the cost to repair the damaged paint (covered) or part of the cost to correct Laynescape's defective work (not covered). As we explain, under the current state of the law, reasonable minds could disagree on the answer to this question.

The trial court concluded the cost of removing and replacing the backfilled dirt and landscaping was a covered risk and, citing a series of cases, stated "[t]he undisputed circumstances here bring this case into the ambit of a variety of decisions spanning almost 50 years." The trial court relied primarily on five cases. In *Hauenstein v. St. Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122] (*Hauenstein*), the first of these decisions, the insured sold plaster to a contractor for use in constructing a hospital. After the plaster was applied, it shrank and cracked, requiring the contractor to remove the plaster and replaster the walls and ceiling. (*Id.* at p. 124.) The policy excluded " 'injury to or destruction of . . . any goods or products manufactured, sold, handled or distributed by the Insured.' " (*Ibid.*) The Minnesota Supreme Court held the defective plaster caused damage to the building measured by the diminution in market value or the cost of removing the defective plaster and restoring the building to its former condition. (*Id.* at p. 125.)

In *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co.* (1965) 63 Cal.2d 602, 604 [47 Cal.Rptr. 564, 407 P.2d 868] (*Geddes*), the insured sold defective doors that were installed in 76 houses under construction. After the houses were completed, serious defects appeared in the doors: some doors would not open, others would not close, and others fell out. (*Id.* at pp. 604, 606.) As a result, substantial portions of the houses were unusable. (*Id.* at p. 606.) The policy excluded coverage for " 'any injury to or destruction of . . . any goods or products manufactured, sold, handled or distributed by the Insured or work completed by the Insured out of which the accident arises.' " (*Id.* at p. 604, fn. 2.) Following *Hauenstein*, the California Supreme Court held that "while the cost of the doors themselves is within [the exclusion] of the policy, [the insurer] is liable for the expense of installing the replacement doors in addition to the cost of removing those that were defective." (*Id.* at p. 607.) The court rejected the insurer's contention the policy only covered removal of the defective doors because "[t]he 'restoration' of the houses to a doorless condition would, if anything, exacerbate the injury." (*Ibid.*)

In *Baugh Construction Co. v. Mission Ins. Co.* (9th Cir. 1988) 836 F.2d 1164, the contractor laid defective floor slabs in an office building. Repairing the slabs required the destruction and replacement of tenant improvements installed by the owner. (*Id.* at p. 1167.) The court, applying Washington state law, held the diminution in value of the building and damage to the tenant improvements constituted damage to the property of others creating coverage under a property damage liability policy. (*Id.* at pp. 1169–1170.) The court held the diminution in value claim was excluded under a defective products exclusion, but the damage to tenant improvements was not excluded. (*Id.* at p. 1172.)

The fourth case cited by the trial court was *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690], in which the insured was sued for the cost of removing and replacing asbestos-containing building materials. The appellate court assumed for purposes of interpreting the policy language the buildings had been damaged by the asbestos-containing building materials and held "that insofar as [the insured] is held liable for the claimed damage to the buildings, the 'own products' exclusion does not bar coverage." (*Id.* at p. 112.)

Finally, the trial court cited *Economy Lumber Co. v. Insurance Co. of North America, supra,* 157 Cal.App.3d 641, 649. There, the insured sold defective siding to a contractor who installed the siding on the exterior of houses, causing them to appear unsightly. The appellate court held the cost of the siding itself fell within the "own products" exclusion, but, under *Hauenstein* and *Geddes,* the diminution in value of the houses was property

damage for which the policy provided coverage. (*Economy Lumber Co. v. Insurance Co. of North America, supra,* at pp. 649–651.)

These decisions support the undisputed proposition the damaged paint on the exterior of the retaining walls was a covered risk and did not fall within the "own work" exclusion. Thus, the cost of removing the damaged paint and of repainting the retaining walls (or the diminution in value of the property, which the Krusiewiczes do not claim) was indemnifiable under the Policy. These decisions also support the undisputed proposition the cost of sealant and the cost of applying the sealant to the backside of the retaining walls fell within the exclusion and were not covered. But other than *Baugh Construction Co. v. Mission Ins. Co.,* which was decided under Washington law, the decisions do not address the critical issue in this case of *the scope of covered remediation*; that is, whether the Policy required CalFarm to pay only for removal of the damaged paint and for repainting the walls, or to pay for the more substantial task of removing the backfilled dirt and landscaping to permit the backside of the retaining walls to be resealed.

CalFarm relies primarily on three cases in asserting it only was required to repaint the retaining walls. In *New Hampshire Ins. Co. v. Vieira* (9th Cir. 1991) 930 F.2d 696, 697 (*Vieira*), the insured's defective installation of drywall in the rooms and attics of three housing projects increased the fire risk. To alleviate the increased fire risk, the owners installed additional drywall in the attics, which required them to cut numerous holes in the buildings' roofs. (*Ibid.*) The Ninth Circuit, applying California law, held neither diminution of the housing projects' value nor the cost to install additional drywall in the attics was covered property damage. (*Id.* at pp. 701–702.) "We hold that the nature of the repairs cannot create coverage where none exists. . . . [Citation.] . . . The owner's decision to make repairs which necessitated damaging the roofs years after the settlement does not affect [the insurer]'s liability." (*Id.* at pp. 701–702.)

In *Golden Eagle Ins. Co. v. Travelers Companies* (9th Cir. 1996) 103 F.3d 750, the insured installed defective concrete floors. To repair the floors, nondefective floor coverings had to be removed and replaced. (*Id.* at p. 757.) Because the policy excluded the cost of repairing the insured's own defective work, the court concluded the cost of removing and replacing the floor coverings was excluded from coverage. (*Ibid.*)

In *Blanchard v. State Farm Fire & Casualty Co.* (1991) 2 Cal.App.4th 345 [2 Cal.Rptr.2d 884], the issue presented was whether the insurer had a duty to provide its insured *Cumis* counsel. In describing the relevant policy provisions and the "own work" exclusion, the court stated: "[T]he insurance policy was not a performance bond or guarantee of the work of the general

contractor or subcontractors. The contractor bears the risk of repairing or replacing faulty workmanship, while the insurer bears the risk of damage to the property of others. [Citation.] If, for instance, faulty workmanship in the framing or drywall led to rainwater leaking in and damaging a homeowner's furnishings, appellant would be indemnified for the damage to the furnishings, but not for the cost of repairing or replacing the faulty workmanship. [Citation.]" (*Id.* at pp. 348–349.)

The example offered in *Blanchard v. State Farm Fire & Casualty Co.*, though analogous, is dictum, because the issue presented in the published portion of the opinion was the appointment of *Cumis* counsel. The trial court here distinguished *Golden Eagle Ins. Co. v. Travelers Companies* and *Vieira* on the ground that in those cases the efforts to repair the insured's defective work caused the property damage for which the insured claimed coverage. As the *Vieira* court noted, "the nature of the repairs cannot create coverage where none exists." (*Vieira, supra,* 930 F.2d at p. 701.)

*Vieira* does, however, support the proposition that remedial measures designed to prevent damage from reoccurring are not covered. (*Vieira, supra,* 930 F.2d at p. 702.) In *Vieira,* the Ninth Circuit rejected the argument the policy should cover the cost of repairs to the attics because the repairs were remedial measures designed to diminish the risk of future fire damage. (*Ibid.*) The court stated: "In the present case, awarding the cost of preventive measures to [the insured] would transform the liability insurance to a performance bond, requiring [the insurer] to assume the cost of making good on [the insured]'s duty to perform under the contract. [The insured] was hired to install drywall to reduce risk of fire. He failed to do so. To require [the insurer] to now assume this cost would be to reward [the insured] for his poor workmanship." (*Ibid.;* see also *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 843 [274 Cal.Rptr. 820, 799 P.2d 1253] ["prophylactic costs— incurred to pay for measures taken in advance of any [damage]—are not incurred 'because of property damage.' [Citations.] Until such damage has occurred, . . . there can be no coverage under CGL policies"].) This authority supports CalFarm's position that the Policy did not require CalFarm to indemnify the cost of making remedial repairs to the retaining walls to prevent paint from cracking in the future.

The case law thus does not clearly resolve, one way or the other, the precise coverage issue presented here. CalFarm could make an objectively reasonable determination the costs of removing and replacing the backfilled dirt and landscaping came within the Policy's "own work" exclusion because those costs were necessary to repair Laynescape's defective work in failing to

apply the correct number of coats of sealant. CalFarm could reasonably assert that its indemnity obligation was limited to removing the damaged paint and repainting the exterior of the walls, and that resealing the backside of the retaining walls would be purely preventative, designed to prevent future paint damage caused by the defectively applied sealant. (See *Vieira, supra,* 930 F.2d at p. 702.)

CalFarm's coverage decision was objectively reasonable, and, therefore, CalFarm cannot be liable for bad faith breach of the insurance policy. The Krusiewiczes sought punitive damages only under their cause of action for bad faith breach of insurance policy. No other cause of action they asserted permits recovery of punitive damages. As a result, the punitive damage award must be reversed.

### DISPOSITION

Based upon the jury's finding of estoppel, CalFarm is liable for the entire amount of the arbitrator's award, except for the cost of sealant, which was agreed to be $8,000. Accordingly, the judgment is affirmed except for the award of punitive damages, which is reversed. Since each side prevailed in part, in the interest of justice, no party may recover costs incurred on appeal.

Bedsworth, Acting P. J., concurred.

**MOORE, J.,** Dissenting.—I agree with the majority that the evidence supported the jury's finding of estoppel and that, therefore, CalFarm Insurance Company (CalFarm) was obligated to pay the full amount of the arbitration award. However, I respectfully disagree with the majority's analysis regarding the bad faith claim against CalFarm.

As *Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847 [29 Cal.Rptr.2d 258] makes clear, "a judgment creditor of an insured enjoys third party beneficiary status and rights under the policy" and "may enforce implied contractual covenants, including the covenant of good faith." (*Id.* at p. 1857.) That is precisely what judgment creditors Tadeusz and Betty Krusiewicz sought to do—to enforce the covenant of good faith and fair dealing as implied in the policy.

The policy requires CalFarm to pay on Laynescape, Inc.'s (Laynescape) behalf all sums which Laynescape becomes legally obligated to pay as damages because of covered property damage. Clearly, once the binding arbitration award was confirmed to judgment, Laynescape was legally obligated to pay the damages set forth therein. CalFarm apparently asserted that just because Laynescape had become legally obligated to pay the award that

did not mean the entirety of the award represented covered property damage. However, the jury rejected this premise. The jury found that DeGrave was the agent of CalFarm, who had the authority to bind CalFarm, and did bind CalFarm to pay the entire amount of the arbitration award. Since CalFarm was then obligated to pay the full amount of the award pursuant to the policy, and the Krusiewiczes as judgment creditors had a right to require CalFarm to make good on the policy terms, CalFarm was obligated to make full payment, in good faith, to the Krusiewiczes.

The majority says this analysis is faulty because an award of punitive damages can only be made under the cause of action for bad faith breach of the policy and the agreement to pay the arbitration award is not a part of the policy—it arises only out of the application of the doctrine of promissory estoppel. However, we cannot forget that trial court judgments are presumed to be correct on appeal. (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928 [76 Cal.Rptr.2d 866].) Here, it is not crystal clear whether the jury found that the policy had in effect been amended to require automatic payment in full of the arbitration award once confirmed to judgment and whether this was the basis of the jury's award of punitive damages. However, we must indulge all intendments and presumptions to support the judgment. (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561 [20 Cal.Rptr.2d 132].) "The right to a jury trial [is] embodied in article I, section 16 of the California Constitution . . . . [Citation.]" (*Bahl v. Bank of America* (2001) 89 Cal.App.4th 389, 395 [107 Cal.Rptr.2d 270].) As we have stated, the right to have a dispute settled by a jury of one's peers is a hallowed right. (*Ibid.*) When it is a close call, we must support the jury award, and that includes the award of punitive damages in this case.

In any event, there are other reasons why I do not agree with the majority's analysis regarding the availability of punitive damages under the bad faith breach of insurance policy cause of action. The test for bad faith liability is generally " ' "whether the refusal to pay policy benefits [or the alleged delay in paying] was *unreasonable*." ' [Citations.] While the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence. [Citation.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346 [108 Cal.Rptr.2d 776].) This is not a case where only one reasonable inference can be drawn from the evidence. The question of bad faith in this instance is a question of fact that was properly submitted to the jury. The jury found that CalFarm had acted in bad faith, and there is substantial evidence to support this finding.

The majority contends that the issue of bad faith is not a question of fact in this instance, but a question of law, relying on *Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973–974 [135 Cal.Rptr.2d 718]. In that case, this court held that the question of insurance bad faith there at issue "turn[ed] on the reasonableness of the legal argument advanced by Revere, [and] present[ed] a pure question of law . . . . [Fn. omitted]" (*Id.* at p. 973.) In its first footnote, the court explained: "We recognize there are numerous cases reciting that [the] 'reasonableness' of a defendant's conduct is a factual question for the jury. However, the reasonableness of the legal position taken by Paul Revere depends entirely on an analysis of legal precedent and statutory language. Those are matters of law, not facts which can effectively be ascertained by lay jurors." (*Id.* at p. 973, fn. 1.)

In *Morris v. Paul Revere Life Ins. Co., supra,* 109 Cal.App.4th 966, an insurance company denied disability benefits on account of its interpretation of Insurance Code section 10350.2, pertaining to certain circumstances under which the insurer cannot deny disability benefits. At the time, there was a split of legal authority nationwide and a case on point pending before the California Supreme Court. Under the circumstances, it was clear that the case law interpreting the statutory provision at issue was unsettled. Clearly, the issue of bad faith turned "on an analysis of legal precedent and statutory language" which could not be performed by lay jurors. (109 Cal.App.4th at p. 973, fn. 1.) In that case, then, the issue of bad faith was a question of law.

Contrast the situation before us. Here, we do not have a question of statutory interpretation. No one has mentioned a case on point pending before the Supreme Court. For reasons I will show, I simply do not agree with the majority's characterization of the applicable law as unsettled. Consequently, I also disagree with its conclusion that the state of the law excused CalFarm's behavior and that bad faith in this context is a question of law.

There is no claim that the walls Laynescape built are defective. Put another way, there is no assertion that the work product of the insured is defective such that the work product exclusion under the policy would apply. To the contrary, CalFarm itself has acknowledged that the walls are sound. The only issue is the damage to the paint, which occurred because the walls were not sealed properly. As the majority acknowledges, "[t]o prevent paint damage from reoccurring, the back of the walls had to be resealed, which required removing the backfilled soil and landscaping, and replacing the soil and landscaping after the walls had been resealed." (Maj. opn., *ante*, p. 278.) The resealing was not necessary to correct a defective wall; the wall was not defective. The resealing, and the work that had to be done to permit the

resealing, were necessary to prevent paint damage from reoccurring perpetually. Under these circumstances, California law is clear. All the work that must be performed in order to correct the continuing damage to the paint constitutes covered damages. To the extent the majority disagrees, I disagree with the majority.

As the majority states, the trial court cited several cases in support of its conclusion that the cost of removing and replacing the backfilled dirt and landscaping was a covered risk. Those cases include *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co.* (1965) 63 Cal.2d 602 [47 Cal.Rptr. 564, 407 P.2d 868], *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 [52 Cal.Rptr.2d 690], *Baugh Const. Co. v. Mission Ins. Co.* (9th Cir. 1988) 836 F.2d 1164, and *Hauenstein v. St. Paul-Mercury Indem. Co.* (1954) 242 Minn. 354 [65 N.W.2d 122]. The majority says that these cases show that the damaged paint was a covered risk and the cost of the sealant was not, but that none of them answers the question whether the cost of removing the backfilled dirt and landscaping and replacing the same, in order to permit resealing, was a covered risk. I disagree.

We need only look at the California Supreme Court case to answer the question. In *Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co., supra,* 63 Cal.2d 602, the insured supplied defective doors for a housing project. The contractor who installed the doors obtained a $100,000 judgment against the insured and then proceeded against the insured's insurance company for the amount of the judgment. Under the insurance policy, damage to the insured's goods was excluded from coverage, but because the policy insured against damage to other property, the expenses incurred in repairing the houses were covered. The court held that the insurance company was "liable for the expense of installing the replacement doors in addition to the cost of removing those that were defective." (*Id.* at p. 607.) It stated the general rule that "the damages should be measured by the diminution in the value of the building or the cost of removing the defective product and restoring the building to its former condition, whichever is less." (*Id.* at pp. 604–605.) Here, the issue is not diminution in value, but the cost of removing completed work in order to permit the resealing of the walls, so that the paint may be restored to its former condition.

The *Geddes* court cited with approval the case of *Bundy Tubing Company v. Royal Indemnity Company* (6th Cir. 1962) 298 F.2d 151. (*Geddes & Smith, Inc. v. St. Paul Mercury Indem. Co., supra,* 63 Cal.2d at p. 607.) In *Bundy,* the insured manufactured steel tubing for use in radiant heating systems. After some of the tubing had been installed in cement floors, it

became defective. While the cost of the tubing itself was not covered under the insurance policy, the cost of removing the defective tubing (including ripping up the old concrete) and installing new tubing within the cement floors (apparently including laying new concrete) was covered. (*Bundy Tubing Company v. Royal Indemnity Company, supra,* 298 F.2d at pp. 153–154.)

Applying these two cases to the one before us, it is obvious that the cost of the sealant itself is not covered, as the majority states. However, the cost of removing as much of the work as necessary in order to bare the walls and enable the application of the sealant is covered, so as to return the paint to its original condition and ensure that it does not forever bubble and peel.

As the majority sees it, CalFarm has cited three cases undermining this conclusion, i.e., *Blanchard v. State Farm Fire & Casualty Co.* (1991) 2 Cal.App.4th 345 [2 Cal.Rptr.2d 884], *Golden Eagle Ins. Co. v. Travelers Companies* (9th Cir. 1996) 103 F.3d 750, and *New Hampshire Ins. Co. v. Vieira* (9th Cir. 1991) 930 F.2d 696. However, I do not view these cases in the same light as does the majority.

In *Blanchard v. State Farm Fire & Casualty Co., supra,* 2 Cal.App.4th 345, the issue was whether the insurance company was liable for failure to appoint independent counsel. This is not an issue in the case before us. *Blanchard* is inapplicable, notwithstanding its dictum concerning property damage exclusion endorsements.

In *Golden Eagle Ins. Co. v. Travelers Companies, supra,* 103 F.3d 750, the insured had installed defective concrete floors. The court held that the defective workmanship was not covered under the insurance policy in question. The case is distinguishable from the one before us because in the case before us the product is not defective. Therefore, *Golden Eagle* also has no application in the context at hand.

Finally, in *New Hampshire Ins. Co. v. Vieira, supra,* 930 F.2d 696, the court addressed whether the diminution in value of housing due to the defective installation of drywall constituted property damage as defined under the insurance policy at issue. The court concluded that it did not. (*Id.* at pp. 697–698, 700–701.) However, in the case before us, whether "diminution of value . . . constitutes 'physical injury to or destruction of tangible property[]' " is not at issue. (*Id.* at p. 698.) Simply put, *New Hampshire*, like the other two cases, is inapposite.

The majority states that because case law does not clearly resolve the coverage issue presented in this case, CalFarm could make an objectively reasonable determination "that its indemnity obligation was limited to removing the damaged paint and repainting the exterior of the walls." (Maj. opn., *ante*, at p. 292.) Having concluded that CalFarm's position was objectively reasonable, the majority further concludes that CalFarm could not be held liable for bad faith breach of the policy and that punitive damages were unavailable under that cause of action. As indicated above, I disagree with the assertion that California case law would permit an objectively reasonable determination that covered damages included only the cost of removing the damaged paint and repainting the walls. Therefore, even were I to agree that the issue of bad faith was a question of law in this instance, I would still disagree with the majority's conclusion that CalFarm did not act in bad faith in failing to pay the entirety of the award as covered damages for which Laynescape had become liable.

A petition for a rehearing was denied July 19, 2005, and respondents' petition for review by the Supreme Court was denied October 19, 2005. Kennard, J., did not participate therein.