[Cite as *Peddler's Junction, L.L.C. v. Washington Square, L.L.C.*, 2025-Ohio-3054.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY


PEDDLER'S JUNCTION, LLC,                    :

                     Plaintiff-Appellant,    :    Case No.  24CA7

                   v.                       :

WASHINGTON SQUARE, LLC,                     :    DECISION AND JUDGMENT ENTRY

 et al.,

                            :

                   Defendants-Appellees.

_____

APPEARANCES:

Clay K. Keller, Akron, Ohio, for appellant.

Adam J. Schwendeman, Marietta, Ohio, for appellees.
_____

CIVIL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:8-21-25
ABELE, J.

{¶1}  This is an appeal from a Washington County Common Pleas Court summary judgment in favor of Washington Square, LLC and Jetlag LLC, defendants below and appellees herein. Peddler's Junction, LLC, plaintiff below and appellant herein, assigns the following errors for review:

        FIRST ASSIGNMENT OF ERROR:

        "THE TRIAL COURT ERRED WHEN GRANTING
        APPELLEE'S MOTION TO STRIKE APPELLANT'S
        DEMAND FOR ITS CLAIMS TO BE DECIDED BY A
        JURY ON ALL ISSUES TRIABLE BY A JURY."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN GRANTING
APPELLEE JETLAG, LLC'S MOTION FOR SUMMARY
JUDGMENT."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED WHEN GRANTING
APPELLEE WASHINGTON SQUARE LLC'S MOTION FOR
SUMMARY JUDGMENT."

**{¶2}** This appeal arises out of appellant's attempt to secure a written lease agreement with appellees for premises located at the Belpre Shopping Center. Between 2017 and 2020, appellant had a written lease agreement with the owner of the shopping center, Washington Square. As the end of the lease term approached, appellant and Washington Square began to discuss a new lease agreement. The parties, however, were unable to finalize a new, written agreement before the lease expired. Appellant remained at the premises as a month-to-month, holdover tenant with the expectation that the parties would finalize a written lease agreement.

**{¶3}** In August 2020, Washington Square's counsel, Abraham

Sellers, sent appellant a proposed draft lease to review. Shortly thereafter, appellant's prior counsel, Adam Baker, responded to Sellers with a 14-page letter that contained a list of "provisions in the proposed lease that appellant was "in disagreement with or [had] clarifications."  The letter concluded with a statement that appellant and its counsel "were confident that the parties will have a finished commercial lease agreement soon."

{¶4}  The evidence is somewhat disputed as to what transpired over the next few weeks.  Appellant's complaint indicates that, after its prior counsel (Baker) sent the letter to Sellers, the two attorneys had further discussions.  The complaint states: "On September 30, 2020, Sellers had communications with Baker to review the status of the lease and different points being finalized."  In its response to Washington Square's summary judgment motion, appellant submitted evidence to support this averment.  Exhibit 10 is a copy of a September 29, 2020 email exchange between Sellers and Baker that discussed scheduling a phone call for the next day, September

30, 2020.

{¶5} However, appellant also submitted an affidavit from Baker in which he stated that correspondence with Washington Square ceased after he sent the letter to Sellers. Appellant repeats this assertion in its appellate brief and states: "Shortly following the date the [l]etter was sent, Washington Square ceased correspondence regarding the lease, bringing discussions to a halt."

{¶6} Sellers, on the other hand, stated that, after he received Baker's letter, he and Baker had a telephone conversation. Sellers informed Baker that Washington Square was not going to be able to accept some of appellant's proposed modifications. Sellers advised Baker that he believed the parties "were really far apart."

{¶7} Nevertheless, the parties do not dispute that, on October 2, 2020, Sellers notified appellant that Washington Square would not be executing a new lease because the shopping center was under contract to be sold. Sellers informed

appellant that the new owner would address the terms of a new lease, and until then, appellant would remain a month-to-month tenant.

{¶8} In November 2020, Washington Square sold the shopping center to Jetlag, which is owned by Sellers and Mark Mondo.

{¶9} In February 2021, Sellers spoke with Nathan Tanner, appellant's chief operating officer, who had been working with Washington Square to secure a new lease. When Tanner asked Sellers about obtaining a new lease, Sellers told Tanner that Jetlag was not ready to provide a lease and that, in June 2021, Sellers expected to be ready to discuss a new lease. Sellers gathered that Tanner had concerns about not having a lease and told Tanner "something to the effect" that he would "get [appellant] a lease. Don't worry. I'm not going to kick you out. I'm not going to throw you out." Sellers further informed Tanner that appellant could remain as a month-to-month tenant until the parties could finalize a new lease.

{¶10} Tanner recorded notes from the February 2021 conversation with Sellers and identified three key statements

6

that Sellers made: (1) "[h]e will not kick Peddler's Junction out / he has ZERO plans to do such"; (2) "[h]e does NOT wish [to] change rent – AT LEAST through 2021"; and (3) "[h]e wishes to create a longer term lease with peddlers junction [sic]." Tanner further recorded two qualifications to Sellers's statement that he wished to create a longer-term lease with appellant: (1) "[h]e does ask to have an informal conversation about a lease"; and (2) "[h]e also does ask for us to plan to have that discussion – but not until June 2021.  This will give him time to continue to work on other projects for the plaza at this point."

{¶11} Near the end of May 2021, Tanner sent an email to Sellers to ask about a lease.  Sellers responded by asking Tanner if they could have a telephone conversation.  Tanner, however, asked Sellers to send a written document with lease terms that he could review.  Sellers, however, advised Tanner that he believed that the parties first should discuss rent because if the parties could not agree to the rent terms, then he did not see a "need to invest time in all of the other terms

of the lease." Sellers informed Tanner that, due to the "rent terms," he did not believe that the parties would "get to the other terms of the lease." Sellers stated that rent would "be significantly different than what [appellant was] accustomed to under the current the month-to-month tenancy."

{¶12} Tanner responded, "As we discussed [i]n February, we had an oral agreement on rent, at least for the short term. Has this now changed? Please send over your proposed terms, and general lease details in email." Sellers indicated that "the month-to-month rent in place currently has not changed" and agreed to "forward proposed terms and pricing" within the next few days.

{¶13} Sellers claimed that he subsequently dropped off a copy of the lease at appellant's place of business. Tanner, however, stated that appellant did not receive a copy of the lease. Nevertheless, after the end of May 2021, the parties did not exchange any further communications regarding a new lease.

{¶14} By letter dated September 21, 2021, Jetlag informed appellant that it was terminating appellant's month-to-month

tenancy and that appellant's last day of occupancy would be October 31, 2021.  Jetlag offered to extend this deadline if appellant needed additional time.  On October 14, 2021, appellant vacated the premises.

**{¶15}** Approximately 10 months later, appellant filed a complaint against Washington Square and Jetlag that asserted separate promissory-estoppel claims.  Appellant alleged that, after its lease had expired, Washington Square, through its owner Victoria Higgins, "made numerous clear and unambiguous assurances to [appellant] that Washington Square would renew [appellant]'s lease," including the following:  (1) a June 25, 2020 message from Higgins to Tanner that stated, "It's going to be next week before we are ready to discuss the lease.  We have yours and a couple others we are working on"; (2) a July 3, 2020 communication from Higgins to Tanner that stated, "We got the lease from our lawyer" who "had to go back in and change some things . . . I will get with you as soon as possible"; (3) a July 15, 2020 message from Higgins to Tanner that stated, "I want to try to get the lease to look over, today or tomorrow";

9

and (4) a July 17, 2020 message that Higgins sent to Tanner in which she stated that she had "jumped the gun on the lease" and expected to have one to him "soon."  Appellant claimed that Washington Square repeatedly assured appellant that it "would renew the lease."

{¶16} Appellant alleged that Sellers sent a draft lease to its previous attorney, Baker, and that Baker followed up by sending a letter to Sellers "negotiating specific provisions of the new drafted lease."  Appellant further asserted that on September 30, 2020, Sellers and Baker reviewed "the status of the lease and different points being finalized," and "Sellers also indicated that he would be talking with his client for them to finish a written response to get the lease completed." Appellant claimed that it relied on "Washington Square's continued promises that it would renew [appellant]'s lease" and that appellant suffered injury by being "forced to remain in a month-to-month tenancy," without "the protection which would have otherwise been provided under an executed, written lease."

{¶17} Appellant alleged that, after Washington Square sold the property to Jetlag, Tanner contacted Sellers to ask about a new, written lease. Appellant asserted that on February 12, 2021, Tanner and Sellers had a phone conference during which "Sellers made numerous clear and unambiguous assurances regarding a new written lease between Peddler's and Jetlag," including the following: (1) "Jetlag would negotiate a new lease, but not until June 2021 since Jetlag had more pressing obligations"; (2) "Jetlag would not kick Peddler's from the [p]roperty and had zero plans to do so"; and (3) "Jetlag would not increase Peddler's rent at least through 2021." Appellant claimed that it "reasonably relied on Sellers' clear and unambiguous assurances that Jetlag would not oust Peddler's from the [p]remises and that Jetlag would enter into a new lease with [appellant]."

{¶18} Appellant claimed that each appellee "made clear and unambiguous promise[s]" to appellant: (1) Washington Square promised to renew the lease; and (2) Jetlag promised to "execute a new written lease." Appellant averred that (1) it reasonably

relied on each appellee's promise, (2) each appellee knew or should have known that it relied on the promises, and (3) appellant suffered damages as a result.

**{¶19}** Washington Square and Jetlag later filed separate summary judgment motions. Jetlag asserted that (1) it had not promised to sign a new lease, (2) appellant's "reliance on any purported promise" that Jetlag made to enter into a future lease "was unreasonable as a matter of law," (3) the statute of frauds barred appellant's claim, and (4) "enforcement of the purported promise [was] not necessary to prevent an injustice."

**{¶20}** Washington Square argued that it provided a proposed lease to appellant, and appellant responded with a written list of items to negotiate. Washington Square thus contended that it fulfilled its promise to provide appellant with a new, written lease. Washington Square further asserted that (1) any reliance appellant placed on its promise to renew a lease "based upon unknown terms was unreasonable as a matter of law," (2) the statute of frauds barred appellant's claim, and (3) "enforcement of the purported promise [was] not necessary to prevent an

injustice."

**{¶21}** In response, appellant asserted that the evidence showed that both appellees consistently represented "that a new lease would eventually be signed" and that these representations constituted "a clear promise." Both appellees "expressly indicated" that each "would provide a lease agreement so that [appellant] could remain" a tenant at the shopping center. Appellant stated that it "relied on those promises by remaining a month-to-month tenant . . . with the understanding that its lease would be renewed in the near future." Appellant alleged that Jetlag, through its representative, Sellers, made "fraudulent and misleading" representations.

**{¶22}** On March 8, 2024, the trial court entered summary judgment in appellees' favor. The court found that no genuine issues of material fact remained to be determined at trial regarding whether Washington Square agreed to execute a new, written lease with appellant. The court concluded that the evidence failed to establish any genuine issue of material fact as to whether Washington Square made a clear and unambiguous

promise.  The court further found that any reliance appellant placed on Washington Square's statements of future intent or desire to enter into a lease was unreasonable as a matter of law.  The court stated that the parties were sophisticated and that the lease was "a complex business transaction."

**{¶23}** The court also determined that the statute of frauds barred appellant's claim.  The court stated that the subject matter of the alleged agreement, a lease of real property, required a writing.  The court recognized that promissory estoppel is a recognized exception, but concluded that no genuine issues of material fact remained as to whether there was a misrepresentation that the statute of fraud's requirements had been complied with or a promise to make a memorandum of the agreement.

**{¶24}** The trial court likewise found that no genuine issues of material fact remained regarding appellant's promissory-estoppel claim against Jetlag.  The court stated that the evidence failed to show the existence of a genuine issue of material fact as to whether Jetlag made an unambiguous promise

to either execute a new, written lease, or to continue appellant's tenancy for any definite or indefinite period of time. The court also determined that any reliance appellant placed on Jetlag's alleged promises was unreasonable as a matter of law. The court also found that the statute of frauds barred appellant's claim.

{¶25} The court thus entered summary judgment in appellees' favor. This appeal followed.

I

{¶26} For ease of discussion, we first consider appellant's second and third assignments of error. Additionally, because the two assignments of error raise similar issues, we have combined them for purposes of review.

{¶27} In its second and third assignments of error, appellant challenges the trial court's decision to enter summary judgment in appellees' favor. In its second assignment of error, appellant argues that the trial court incorrectly entered summary judgment in Jetlag's favor. Appellant contends that genuine issues of material fact remain regarding each element

required to establish its promissory-estoppel claim. Appellant states that the court's finding that "there was no unambiguous promise by Jetlag, LLC to either execute a new written lease with [appellant] or to not kick [appellant] out (terminate its tenancy) for any definite or even indefinite period of time" "is directly contrary to the deposition testimony and affidavits in the record."

{¶28} In its third assignment of error, appellant asserts that the trial court erred by entering summary judgment in Washington Square's favor. Appellant contends that genuine issues of material fact remain as to whether (1) Washington Square fulfilled its promises to execute a new written lease and (2) appellant reasonably relied on Washington Square's promises.

A

{¶29} Appellate courts conduct a de novo review of trial court summary judgment decisions. *E.g., Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 10, citing *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Accordingly, an appellate court need not defer to a trial court's decision, but

16

instead must independently review the record to determine if summary judgment is appropriate. *Grafton*, 77 Ohio St.3d at 105.

Civ.R. 56(C) provides in relevant part:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶30} Therefore, pursuant to Civ.R. 56 a trial court may not award summary judgment unless the evidence demonstrates that (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) after viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the

nonmoving party.  *E.g., State ex rel. Whittaker v. Lucas Cty. Prosecutor's Office*, 2021-Ohio-1241, ¶ 8; *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

B

**{¶31}** Promissory estoppel is an equitable doctrine designed to remedy the harm that a promisee suffers by reasonably and detrimentally relying on a promisor's clear and unambiguous promise.  *See Karnes v. Doctors Hosp.*, 51 Ohio St.3d 139, 142 (1990) (promissory estoppel "is not a contractual theory but a quasi-contractual or equitable doctrine designed to prevent the harm resulting from the reasonable and detrimental reliance of an employee upon the false representations of his employer."). The promissory-estoppel doctrine provides as follows:  "'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'"  *Hortman v. Miamisburg*, 2006-Ohio-4251, ¶ 23, quoting Restatement of the Law 2d, Contracts, § 90 (1981); *see also Ed*

*Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 439 (1996).  The doctrine "'comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice.'"  *Olympic Holding Co. v. ACE Ltd.*, 2009-Ohio-2057, ¶ 39, quoting *Doe v. Univision Television Group, Inc.*, 717 So.2d 63, 65 (Fla.App.1998).

{¶32} A successful promissory-estoppel claim requires the promisee to establish the following elements: (1) the promisor made a clear and unambiguous promise; (2) the promisee reasonably and foreseeably relied on the promise; and (3) the promisee detrimentally relied on the promise, i.e., the party relying on the promise must have been injured.  *See, e.g.,* Restatement of the Law 2d, Contracts, § 90 (1981); *Doe v. Adkins*, 110 Ohio App.3d 427, 437 (4th Dist. 1996) (promissory estoppel requires a clear and unambiguous promise, the promisee's reasonable and foreseeable reliance on the promise, and injury resulting from the reliance); *Black's Law Dictionary* (12th ed. 2024) ("detrimental reliance" means "[r]eliance by one party on the acts or representations of another, causing a

19

worsening of the first party's position"); 4 *Williston on Contracts* § 8:6 (4th ed.) (enforcing "the promise must be necessary to avoid an injustice, presumably caused by the promisee's reliance on the promise and the concomitant change in the promisee's position, that would result if the promise were not enforced").

{¶33} The threshold issue in a promissory estoppel case is the existence of a clear and unambiguous promise from the promisor to the promisee. *See McCroskey v. State*, 8 Ohio St.3d 29, 30 (1983) ("in order for [the plaintiff's] claim to succeed the threshold element of a promise must be met"); *Bd. of Cty. Commrs. of Wood Cty. v. Toledo*, 1993 WL 372243, *5 (6th Dist. Sept. 24, 1993) ("Absent a promise, there can be no promissory estoppel, nor can there be any other type of contract express or implied"). A promise is defined as "'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Stull v. Combustion Engineering, Inc.*, 72 Ohio App.3d 553, 557 (3d Dist. 1991), quoting Restatement of the Law,

Contracts 2d, § 2(1) (1981). A clear and unambiguous promise is one that is "definite in the sense of being clearly a promise and not just a statement of intentions." *Garwood Packaging, Inc. v. Allen & Co., Inc.* 378 F.3d 698, 702 (7th Cir. 2004). The promise must communicate clear terms that the promisor reasonably would expect to induce reliance. *See McCroskey v. State,* 8 Ohio St.3d 29, 30 (1983) (the promisor must have made a promise to the promisee "which should have reasonably been expected to induce action"); *Zelina v. Hillyer*, 2005-Ohio-5803, ¶ 19 (9th Dist.) ("The promissory estoppel doctrine requires an actual reliance to one's detriment on a clear and unambiguous promise that would be objectively reasonable and foreseeable to rely upon.").

**{¶34}** Thus, "vague or ambiguous references" do not suffice to establish the element of a clear and unambiguous promise. *Hitchcock Dev. Co. v. Husted*, 2009-Ohio-4459, ¶ 24 (12th Dist.); *Middleton v. United Church of Christ Board*, 483 F. Supp.3d 489, 504 (N.D. Ohio 2020) ("Ohio courts have made clear that promissory estoppel requires 'specific promises' and that

'nebulous representations' will not do."). Instead, when "an alleged promise is sufficiently vague or ambiguous that the parties do not have a clear understanding that a commitment has been made and, specifically, what that commitment is or requires, there is no promise to be enforced under the doctrine of promissory estoppel." *Zapata Real Estate, L.L.C. v. Monty Realty, Ltd.*, 2014-Ohio-5550, ¶ 40 (8th Dist.) (trial court properly entered summary judgment in promissory-estoppel case when the promise that lender agreed "to 'work with' a borrower to 'restructure' a loan" was "ambiguous on its face"); *see Garb-Ko, Inc. v. Benderson,* 2013-Ohio-1249, ¶ 20 (10th Dist.) (plaintiff's complaint failed to state a claim for promissory estoppel when defendants allegedly represented in correspondence that plaintiff had "renewal options" but did not set forth a promise that plaintiff had an option to renew, "much less 'a clear, unambiguous promise"'). Consequently, "the promise of a generic future agreement with many missing terms" is insufficient to serve as the basis for a promissory-estoppel

claim.  *Arett v. Gardens Alive Farms LLC*, 2022 WL 1024626, \*4 (6th Cir. Apr. 6, 2022).

**{¶35}** Additionally, promissory estoppel ordinarily cannot be based on "preliminary negotiations subject to formal approval and acceptance."  *McCroskey*, 8 Ohio St.3d at 31; *see also Keil v. Glacier Park, Inc.*, 188 Mont. 455, 462-63 (1980) (promissory estoppel "cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a contract").  In *McCroskey*, for example, the court determined that "the collapse of negotiations for the construction and lease of office space," *id.* at 29, did not give rise to a valid promissory-estoppel claim when it was based on promises contained in a letter of intent and a proposed lease that the parties never finalized.  In that case, the Ohio Department of Administrative Services contacted McCroskey (a developer) and other developers to survey interest in constructing a special-purpose building and leasing the building to the State. McCroskey subsequently developed a plan, and he later remained as the sole developer interested in the project.

{¶36} McCroskey and the State subsequently "tentatively agreed on a price per square foot the [S]tate would pay if it leased the proposed space and on the duration of the lease." *Id.* Shortly thereafter, the State sent McCroskey a letter of intent along with proposed lease agreements. A couple of weeks later, however, the State orally informed McCroskey that the State had decided not to proceed with the proposed agreements.

{¶37} McCroskey subsequently filed a complaint and alleged, in part, that "he was entitled to be compensated for his actual losses under the doctrine of promissory estoppel as the [S]tate had induced him to undertake certain actions based upon its promises." *Id.* at 30.

{¶38} The trial court concluded that the State was immune from liability and dismissed the complaint. McCroskey appealed, and the appellate court reversed and remanded the trial court's judgment. The appellate court determined that the record contained sufficient evidence to conclude that McCroskey was entitled to relief under the doctrine of promissory estoppel. The State appealed to the Ohio Supreme Court.

{¶39} The Supreme Court agreed with the State that McCroskey had failed to establish "the sort of promise necessary to invoke promissory estoppel." *Id.* at 31. The court noted that McCroskey had asserted that the State made promises by (1) repeatedly informing him that it would move certain departments from their current locations, (2) selecting him as the developer to build the special-purpose building, (3) agreeing to the terms of the proposed lease, and (4) mailing the letter of intent and proposed lease to McCroskey to sign. The court stated that the evidence showed that "the parties were engaged in the protracted process of negotiating a future arrangement," and that the State had not made any promise that "should reasonably have expected to induce reliance by McCroskey." *Id.* at 31. The court explained:

> The communications between McCroskey and the [State] were in the nature of preliminary negotiations subject to formal approval and acceptance. There existed an executory arrangement, the hazards of which were open, obvious and ongoing. McCroskey pursued an opportunity for an advantageous business proposal knowing fully the risks attendant to such ventures. This pursuit required the expenditure of his own time and funds. Now that the deal has fallen through, McCroskey wants the [S]tate to absorb responsibility for the risks he undertook. Such

> a proposition, unaccompanied by an identifiable promise, does not rise to a right of recovery.

*Id.* at 31-32; *see also* Baird, *Unlikely Resurrection: Richard Posner, Promissory Estoppel, & the Death of Contract*, 86 U. Chi. L. Rev. 1037, 1056, fn. 25 (2019), quoting Lon L. Fuller, *Consideration and Form*, 41 Colum.L.Rev. 799, 813 (1941) ("'Business deals can often emerge only from a converging series of negotiations . . . . To surround with rigid legal sanctions even the first exploratory expressions of intention would not only introduce an unpleasant atmosphere into business negotiations, but would actually hamper commerce.'").

**{¶40}** Moreover, "[a] mere expression of future intention . . . does not constitute a sufficiently definite promise to justify reasonable reliance thereon." *Santoni v. Fed. Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir. 1982), citing *Granfield v. Catholic Univ. of America*, 530 F.2d 1035, 1039-40 (D.C.Cir.); *Sec. Bank & Trust Co. v. Bogard*, 494 N.E.2d 965, 968-69 (Ind.App. 1986) ("the mere expression of an intention is not a promise"); *Union Mut. Life Ins. Co. v. Mowry*, 96 U.S. 544, 547-48 (1877) ("An estoppel cannot arise from a promise as to future

action with respect to a right to be acquired upon an agreement not yet made" and "has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the person complaining is to be a party"). Thus, for example, a statement that a bank employee informed the plaintiff that the employee would take the plaintiff's loan application to the loan committee and "ought to have something" within two or three days did not constitute a clear and unambiguous promise. *Sec. Bank & Trust*, 494 N.E.2d at 969. Instead, the first half of the statement constituted "an expression of intention" and the second half "was a prediction," with neither being sufficient to establish a clear and unambiguous promise. *Id.*

**{¶41}** In the case at bar, we agree with the trial court's conclusion that appellant cannot establish that either appellee made a clear and unambiguous promise sufficient to support a promissory estoppel claim. Instead, the evidence shows that appellees expressed intentions to engage in lease negotiations. Jetlag specifically told appellant that, in June 2021, it would

be ready to engage in lease discussions.  Jetlag did not, however, promise that those lease discussions ultimately would prove successful.  Even if it had, that statement would be a mere prediction, not a promise.  Moreover, Jetlag did not promise to send appellant a lease that contained terms that appellant would find immediately acceptable.  The evidence instead demonstrates the existence of "the promise of a generic future agreement with many missing terms," and this type of generic promise is insufficient to serve as the basis for a promissory-estoppel claim.  *See Arett*, 2022 WL 1024626, at *4 (6th Cir.).

**{¶42}** Washington Square likewise did not promise that it would send appellant a lease that appellant would find immediately acceptable.  Furthermore, Washington Square fulfilled any promise that it made to send appellant a lease.  Before Jetlag purchased the shopping center, Washington Square sent appellant a lease to review.  Appellant did not sign the lease.  Instead, appellant's counsel returned the lease to Washington Square with a 14-page list of provisions in the

proposed lease that appellant was "in disagreement with or [had] clarifications."  The letter concluded with a note that appellant and its counsel "were confident that the parties will have a finished commercial lease agreement soon."

**{¶43}** We believe that appellant's attempt to hold appellees to their alleged promises is even more tenuous than the promisee's attempt in *McCroskey*.  In *McCroskey*, the parties had exchanged written documents outlining the proposed terms of a lease and had tentatively agreed to terms.  Yet, these facts still were not enough to indicate that the promisor had made a clear and unambiguous promise for purposes of promissory estoppel.  In the case sub judice, by contrast, appellant has not produced any evidence that it had tentatively agreed to any terms with either appellee.  Thus, even if a tentative agreement on lease terms was sufficient to establish a clear and unambiguous promise (which, *McCroskey* indicates, it is not), appellant cannot even prove the existence of a tentative agreement.  Instead, the promises that appellant alleges appellees made—to send a lease, sign a lease, enter into a long-

term lease, or execute a lease—all were statements of future intent to engage in further negotiations regarding the terms of a written lease.  *See Sec. Bank & Trust*, 494 N.E.2d at 969; *see also Cent. Jersey Construction Equip. Sales, LLC v. LBX Co., LLC*, 2023 WL 3093575, \*7 (6th Cir. Apr. 26, 2023) (a promise to "enter into a 'new Dealer Agreement' that included an 'expanded territory' if [the plaintiff] opened a new facility" was not definite enough to be enforced under the doctrine of promissory estoppel); *Keil v. Glacier Park, Inc.*, 188 Mont. 455, 464 (1980) ("The parties here had nothing more than an agreement to agree that was in the initial stages of the negotiation process.  This does not constitute the clear and unambiguous promise necessary to satisfy the first element of a promissory estoppel claim."); *Garwood Packaging, Inc. v. Allen & Co., Inc.* 378 F.3d 698, 701 and 704 (7th Cir. 2004) (promise to "see that [a] deal went through 'come hell or high water,'" was not enforceable in promissory estoppel; repeated statements "that the deal would go through, that [promisor's] commitment to invest $2 million was unconditional, that the funding would be forthcoming, and so on"

were not "real promises" but were "expressions of optimism and determination"). Here, neither appellee made a definite promise to send appellant a written lease with unequivocal terms that would be acceptable to appellant. Construing the evidence most strongly in appellant's favor indicates, at best, that appellees promised to engage in further negotiations regarding entering into a new, written lease. As the above case law makes clear, these statements of future expressions of intentions are not sufficient to establish a clear and unambiguous promise for purposes of promissory estoppel.

**{¶44}** Similarly, Jetlag's promise that it did not have plans to evict appellant from the premises was not a clear and unambiguous promise to allow appellant to remain as a tenant indefinitely, or a clear and unambiguous promise to enter into a lease with appellant. Instead, the clear intent of Jetlag's statements was that the parties would discuss lease terms at a later date, and, in the meantime, Jetlag would not ask appellant to vacate the premises.

{¶45} In his deposition, Tanner even confirmed that he interpreted Sellers's statements to mean that appellant "would stay month-to-month until June, and at that time, [Sellers] would set informal discussion when it comes to the lease, renewal lease. He . . . had no plans on changing the terms of . . . anything at the moment," as it concerned appellant's lease, "or charging more rent or anything of that nature." At another point during his deposition, Tanner explained that he interpreted Sellers's statement to mean that it was "an oral agreement that our current status quo situation of being . . . a holdover tenant in our signed lease from Washington Square, that that was continuing in . . . the holdover clause until June, [when] he would then address the new lease."

{¶46} Likewise, even if Jetlag's promise not to increase appellant's rent through at least the end of 2021, was a clear and unambiguous promise, it was not a clear and unambiguous promise to enter into a new written lease agreement or to allow appellant to remain as a tenant through the end of 2021. Tanner even wrote in an email to Sellers that he recognized that the

parties had "an oral agreement on rent, at least for the short term." Thus, appellant explicitly recognized the temporary nature of Jetlag's alleged promise. We further note that appellant has not presented any evidence that Jetlag increased appellant's rent. Instead, in September 2021, Jetlag informed appellant that it would be ending appellant's month-to-month tenancy.

{¶47} We recognize that, ordinarily, whether a promisor made "a clear and unambiguous promise" is a question of fact. *Simon v. Aulino*, 2020-Ohio-6962, ¶ 62 (4th Dist.); *see Kroll v. Close*, 82 Ohio St. 190 (1910), syllabus ("Ordinarily, an issue as to the reasonableness or unreasonableness of anything is a mixed question of law and fact."). When, however, "the facts are clear and undisputed it is purely a question of law." *Kroll* at syllabus; *see also Garwood Packaging, Inc. v. Allen & Co., Inc.* 378 F.3d 698, 702, 705 (7th Cir. 2004) ("Ordinarily the question whether a plaintiff reasonably understood a statement to be a promise is a question of fact and so cannot be resolved in summary judgment proceedings. But if it is clear that the

question can be answered in only one way, there is no occasion to submit the question to a jury," [citations omitted]).

{¶48} In the case sub judice, construing the facts most strongly in appellant's favor leads to only one conclusion.  As we stated above, the evidence fails to show that appellees made any clear and unambiguous promises that can be enforced under the doctrine of promissory estoppel.  Even if appellees' assertions were clear expressions of future intentions, they were not clear and unambiguous *promises* that can be enforced under the doctrine of promissory estoppel.

{¶49} Because appellant cannot establish the threshold requirement necessary to prove a promissory estoppel claim, we need not consider whether genuine issues of material fact remain regarding the remaining elements.  *See McCroskey*, 8 Ohio St.3d at 32 (declining to consider other elements when the plaintiff failed to establish the threshold requirement of a clear and unambiguous promise).  Even if we were to assume, arguendo, that genuine issues of material fact remain regarding whether appellees made any clear and unambiguous promises, appellant

34

cannot establish that it reasonably relied on those promises. *See Heinz & Assoc., Inc. v. Diamond Cellar Holdings, L.L.C.*, 2012-Ohio-1422, ¶ 41 (10th Dist.) ("the exchange of emails discussing proposed lease terms and the exchange of lease drafts between the parties indicates the parties were working toward a signed, written sublease," and the plaintiff's alleged reliance on the defendant's statement that he was "100 percent in" was "unreasonable as a matter of law"); *Carcorp, Incv. v. Chesrown Oldsmobile*, 2007-Ohio-380, ¶ 20 (10th Dist.) (assuming that car dealer's oral promise to sell dealership to plaintiff for $2.1 million was clear and definite, plaintiff could not have reasonably relied on the promise; "the parties did not discuss, let alone agree upon, most of the contract terms that would be necessary to complete this complex business transaction"; "[b]oth parties contemplated that their respective legal counsel would be involved in the negotiation and preparation of a formal asset purchase agreement"; and the "oral promise to sell was, at most, a promise to pursue a formal asset purchase agreement"); *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005-Ohio-4931, ¶

67 (9th Dist.) (promisee's reliance on any purported promise became "patently unreasonable" once promisor stated that it would "not be able to consummate a deal" and the deal "was just never meant to be").

**{¶50}** Furthermore, our determination that the evidence fails to establish a genuine issue of material fact as to whether appellees made a clear and unambiguous promise to appellant obviates the need to consider the remaining arguments contained in appellant's second and third assignments of error.

**{¶51}** Accordingly, based upon the foregoing reasons, we overrule appellant's second and third assignments of error.

II

**{¶52}** In its first assignment of error, appellant asserts that the trial court erred by striking its jury demand.

**{¶53}** In light of our disposition of appellant's second and third assignments of error, we believe that appellant's first assignment of error is moot.  *See* App.R. 12(A)(1)(c).

36

**{¶54}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

37

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellees recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.